# MEDELLIN *v.* TEXAS

CERTIORARI TO THE COURT OF CRIMINAL APPEALS OF TEXAS

No. 06–984. Argued October 10, 2007—Decided March 25, 2008

494

*Donald Francis Donovan* argued the cause for petitioner. With him on the briefs were *Carl Micarelli* and *Catherine M. Amirfar.*

*Solicitor General Clement* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Fisher, Deputy Solicitor General Dreeben, Irving L. Gornstein,* and *Robert J. Erickson.*

*R. Ted Cruz,* Solicitor General of Texas, argued the cause for respondent. With him on the brief were *Greg Abbott,* Attorney General, *Kent C. Sullivan,* First Assistant Attorney General, *Eric J. R. Nichols,* Deputy Attorney General, *Sean D. Jordan,* Deputy Solicitor General, and *Kristofer S. Monson, Daniel L. Geyser,* and *Adam W. Aston,* Assistant Solicitors General.*

*Briefs of *amici curiae* urging reversal were filed for the Government of the United Mexican States by *Sandra L. Babcock;* for the American Bar Association by *Karen J. Mathis* and *Jeffrey L. Bleich;* for Foreign Sovereigns by *Asim M. Bhansali, Steven A. Hirsch, Craig Smyser,* and *Jason Luong;* for Former United States Diplomats by *Harold Hongju Koh, Don-*

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The International Court of Justice (ICJ), located in the Hague, is a tribunal established pursuant to the United Nations Charter to adjudicate disputes between member states. In the *Case Concerning Avena and Other Mexican Nationals (Mex.* v. *U. S.*), 2004 I. C. J. 12 (Judgment of Mar. 31) (*Avena*), that tribunal considered a claim brought by Mexico against the United States. The ICJ held that, based on violations of the Vienna Convention, 51 named Mexican nation-

ald B. Ayer, Charles R. A. Morse, and Christian G. Vergonis; and for Ambassador L. Bruce Laingen et al. by Daniel C. Malone.

Briefs of amici curiae urging affirmance were filed for the Commonwealth of Virginia et al. by Robert F. McDonnell, Attorney General of Virginia, William E. Thro, State Solicitor General, Stephen R. McCullough, Deputy State Solicitor General, and William C. Mims, Chief Deputy Attorney General, and by the Attorneys General for their respective jurisdictions as follows: Troy King of Alabama, Talis J. Colberg of Alaska, Terry Goddard of Arizona, Dustin McDaniel of Arkansas, Edmund G. Brown, Jr., of California, John W. Suthers of Colorado, Joseph R. Biden III of Delaware, Bill McCollum of Florida, Thurbert E. Baker of Georgia, Lawrence Wasden of Idaho, Steve Carter of Indiana, Paul J. Morrison of Kansas, Gregory D. Stumbo of Kentucky, Jim Hood of Mississippi, Jeremiah W. (Jay) Nixon of Missouri, Mike McGrath of Montana, Catherine Cortez Masto of Nevada, Roy Cooper of North Carolina, Wayne Stenehjem of North Dakota, W. A. Drew Edmondson of Oklahoma, Hardy Myers of Oregon, Thomas W. Corbett, Jr., of Pennsylvania, Roberto J. Sánchez-Ramos of Puerto Rico, Henry D. McMaster of South Carolina, Lawrence E. Long of South Dakota, Robert E. Cooper, Jr., of Tennessee, Mark L. Shurtleff of Utah, and Rob McKenna of Washington; for Constitutional and International Law Scholars by Ernest A. Young and Edward C. Dawson; for Former Senior Officials of the Department of Justice by Charles J. Cooper and Brian Stuart Koukoutchos; for the Washington Legal Foundation et al. by Daniel J. Popeo and Richard A. Samp; and for Randy and Sandra Ertman et al. by Kent S. Scheidegger.

Briefs of amici curiae were filed for the European Union et al. by S. Adele Shank and John B. Quigley; for EarthRights International by Judith Brown Chomsky; for International Court of Justice Experts by Lori Fisler Damrosch and Charles Owen Verrill, Jr.; and for the Mountain States Legal Foundation by William Perry Pendley.

als were entitled to review and reconsideration of their state-court convictions and sentences in the United States. This was so regardless of any forfeiture of the right to raise Vienna Convention claims because of a failure to comply with generally applicable state rules governing challenges to criminal convictions.

In *Sanchez-Llamas* v. *Oregon,* 548 U. S. 331 (2006)—issued after *Avena* but involving individuals who were not named in the *Avena* judgment—we held that, contrary to the ICJ's determination, the Vienna Convention did not preclude the application of state default rules. After the *Avena* decision, President George W. Bush determined, through a Memorandum for the Attorney General (Feb. 28, 2005), App. to Pet. for Cert. 187a (Memorandum or President's Memorandum), that the United States would "discharge its international obligations" under *Avena* "by having State courts give effect to the decision."

Petitioner José Ernesto Medellín, who had been convicted and sentenced in Texas state court for murder, is one of the 51 Mexican nationals named in the *Avena* decision. Relying on the ICJ's decision and the President's Memorandum, Medellín filed an application for a writ of habeas corpus in state court. The Texas Court of Criminal Appeals dismissed Medellín's application as an abuse of the writ under state law, given Medellín's failure to raise his Vienna Convention claim in a timely manner under state law. We granted certiorari to decide two questions. *First,* is the ICJ's judgment in *Avena* directly enforceable as domestic law in a state court in the United States? *Second,* does the President's Memorandum independently require the States to provide review and reconsideration of the claims of the 51 Mexican nationals named in *Avena* without regard to state procedural default rules? We conclude that neither *Avena* nor the President's Memorandum constitutes directly enforceable federal law that pre-empts state limitations on the

filing of successive habeas petitions. We therefore affirm the decision below.

## I

## A

In 1969, the United States, upon the advice and consent of the Senate, ratified the Vienna Convention on Consular Relations (Vienna Convention or Convention), Apr. 24, 1963, [1970] 21 U. S. T. 77, T. I. A. S. No. 6820, and the Optional Protocol Concerning the Compulsory Settlement of Disputes to the Vienna Convention (Optional Protocol or Protocol), Apr. 24, 1963, [1970] 21 U. S. T. 325, T. I. A. S. No. 6820. The preamble to the Convention provides that its purpose is to "contribute to the development of friendly relations among nations." 21 U. S. T., at 79; *Sanchez-Llamas, supra,* at 337. Toward that end, Article 36 of the Convention was drafted to "facilitat[e] the exercise of consular functions." Art. 36(1), 21 U. S. T., at 100. It provides that if a person detained by a foreign country "so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State" of such detention, and "inform the [detainee] of his righ[t]" to request assistance from the consul of his own state. Art. 36(1)(b), *id.,* at 101.

The Optional Protocol provides a venue for the resolution of disputes arising out of the interpretation or application of the Vienna Convention. Art. I, 21 U. S. T., at 326. Under the Protocol, such disputes "shall lie within the compulsory jurisdiction of the International Court of Justice" and "may accordingly be brought before the [ICJ] . . . by any party to the dispute being a Party to the present Protocol." *Ibid.*

The ICJ is "the principal judicial organ of the United Nations." United Nations Charter, Art. 92, 59 Stat. 1051, T. S. No. 993 (1945). It was established in 1945 pursuant to the United Nations Charter. The ICJ Statute—annexed to the

U. N. Charter—provides the organizational framework and governing procedures for cases brought before the ICJ. Statute of the International Court of Justice (ICJ Statute), 59 Stat. 1055, T. S. No. 993 (1945).

Under Article 94(1) of the U. N. Charter, "[e]ach Member of the United Nations undertakes to comply with the decision of the [ICJ] in any case to which it is a party." 59 Stat. 1051. The ICJ's jurisdiction in any particular case, however, is dependent upon the consent of the parties. See Art. 36, *id.*, at 1060. The ICJ Statute delineates two ways in which a nation may consent to ICJ jurisdiction: It may consent generally to jurisdiction on any question arising under a treaty or general international law, Art. 36(2), *ibid.*, or it may consent specifically to jurisdiction over a particular category of cases or disputes pursuant to a separate treaty, Art. 36(1), *ibid.* The United States originally consented to the general jurisdiction of the ICJ when it filed a declaration recognizing compulsory jurisdiction under Art. 36(2) in 1946. The United States withdrew from general ICJ jurisdiction in 1985. See U. S. Dept. of State Letter and Statement Concerning Termination of Acceptance of ICJ Compulsory Jurisdiction (Oct. 7, 1985), reprinted in 24 I. L. M. 1742 (1985). By ratifying the Optional Protocol to the Vienna Convention, the United States consented to the specific jurisdiction of the ICJ with respect to claims arising out of the Vienna Convention. On March 7, 2005, subsequent to the ICJ's judgment in *Avena*, the United States gave notice of withdrawal from the Optional Protocol to the Vienna Convention. Letter from Condoleezza Rice, Secretary of State, to Kofi A. Annan, Secretary-General of the United Nations.

## B

Petitioner José Ernesto Medellín, a Mexican national, has lived in the United States since preschool. A member of the

"Black and Whites" gang, Medellín was convicted of capital murder and sentenced to death in Texas for the gang rape and brutal murders of two Houston teenagers.

On June 24, 1993, 14-year-old Jennifer Ertman and 16-year-old Elizabeth Pena were walking home when they encountered Medellín and several fellow gang members. Medellín attempted to engage Elizabeth in conversation. When she tried to run, petitioner threw her to the ground. Jennifer was grabbed by other gang members when she, in response to her friend's cries, ran back to help. The gang members raped both girls for over an hour. Then, to prevent their victims from identifying them, Medellín and his fellow gang members murdered the girls and discarded their bodies in a wooded area. Medellín was personally responsible for strangling at least one of the girls with her own shoelace.

Medellín was arrested at approximately 4 a.m. on June 29, 1993. A few hours later, between 5:54 and 7:23 a.m., Medellín was given *Miranda* warnings; he then signed a written waiver and gave a detailed written confession. App. to Brief for Respondent 32–36. Local law enforcement officers did not, however, inform Medellín of his Vienna Convention right to notify the Mexican consulate of his detention. Brief for Petitioner 6–7. Medellín was convicted of capital murder and sentenced to death; his conviction and sentence were affirmed on appeal. *Medellín* v. *State*, No. 71,997 (Tex. Crim. App., May 16, 1997), App. to Brief for Respondent 2–31.

Medellín first raised his Vienna Convention claim in his first application for state postconviction relief. The state trial court held that the claim was procedurally defaulted because Medellín had failed to raise it at trial or on direct review. The trial court also rejected the Vienna Convention claim on the merits, finding that Medellín had "fail[ed] to show that any non-notification of the Mexican authorities im-

pacted on the validity of his conviction or punishment." *Id.*, at 62.[1] The Texas Court of Criminal Appeals affirmed. *Id.*, at 64–65.

Medellín then filed a habeas petition in Federal District Court. The District Court denied relief, holding that Medellín's Vienna Convention claim was procedurally defaulted and that Medellín had failed to show prejudice arising from the Vienna Convention violation. See *Medellín* v. *Cockrell*, Civ. Action No. H–01–4078 (SD Tex., June 26, 2003), App. to Brief for Respondent 66, 86–92.

While Medellín's application for a certificate of appealability was pending in the Fifth Circuit, the ICJ issued its decision in *Avena.* The ICJ held that the United States had violated Article 36(1)(b) of the Vienna Convention by failing to inform the 51 named Mexican nationals, including Medellín, of their Vienna Convention rights. 2004 I. C. J., at 53–55. In the ICJ's determination, the United States was obligated "to provide, by means of its own choosing, review and reconsideration of the convictions and sentences of the

---

[1] The requirement of Article 36(1)(b) of the Vienna Convention that the detaining state notify the detainee's consulate "without delay" is satisfied, according to the ICJ, where notice is provided within three working days. *Avena,* 2004 I. C. J. 12, 52, ¶ 97 (Judgment of Mar. 31). See *Sanchez-Llamas* v. *Oregon,* 548 U. S. 331, 362 (2006) (GINSBURG, J., concurring in judgment). Here, Medellín confessed within three hours of his arrest—before there could be a violation of his Vienna Convention right to consulate notification. App. to Brief for Respondent 32–36. In a second state habeas application, Medellín sought to expand his claim of prejudice by contending that the State's noncompliance with the Vienna Convention deprived him of assistance in developing mitigation evidence during the capital phase of his trial. This argument, however, was likely waived: Medellín had the assistance of consulate counsel during the preparation of his *first* application for state postconviction relief, yet failed to raise this argument at that time. See Application for Writ of Habeas Corpus in *Ex parte Medellín,* No. 675430–A (Tex. Crim. App., Mar. 26, 1998), pp. 25–31. In light of our disposition of this case, we need not consider whether Medellín was prejudiced in any way by the violation of his Vienna Convention rights.

[affected] Mexican nationals." *Id.*, at 72, ¶ 153(9). The ICJ indicated that such review was required without regard to state procedural default rules. *Id.*, at 56–57.

The Fifth Circuit denied a certificate of appealability. *Medellín* v. *Dretke*, 371 F. 3d 270, 281 (2004). The court concluded that the Vienna Convention did not confer individually enforceable rights. *Id.*, at 280. The court further ruled that it was in any event bound by this Court's decision in *Breard* v. *Greene*, 523 U. S. 371, 375 (1998) *(per curiam)*, which held that Vienna Convention claims are subject to procedural default rules, rather than by the ICJ's contrary decision in *Avena*. 371 F. 3d, at 280.

This Court granted certiorari. *Medellín* v. *Dretke*, 544 U. S. 660, 661 (2005) *(per curiam) (Medellín I)*. Before we heard oral argument, however, President George W. Bush issued his Memorandum for the United States Attorney General, providing:

> "I have determined, pursuant to the authority vested in me as President by the Constitution and the laws of the United States of America, that the United States will discharge its international obligations under the decision of the International Court of Justice in [*Avena*], by having State courts give effect to the decision in accordance with general principles of comity in cases filed by the 51 Mexican nationals addressed in that decision." App. to Pet. for Cert. 187a.

Medellín, relying on the President's Memorandum and the ICJ's decision in *Avena,* filed a second application for habeas relief in state court. *Ex parte Medellín*, 223 S. W. 3d 315, 322–323 (Tex. Crim. App. 2006). Because the state-court proceedings might have provided Medellín with the review and reconsideration he requested, and because his claim for federal relief might otherwise have been barred, we dismissed his petition for certiorari as improvidently granted. *Medellín I, supra,* at 664.

The Texas Court of Criminal Appeals subsequently dismissed Medellín's second state habeas application as an abuse of the writ. 223 S. W. 3d, at 352. In the court's view, neither the *Avena* decision nor the President's Memorandum was "binding federal law" that could displace the State's limitations on the filing of successive habeas applications. 223 S. W. 3d, at 352. We again granted certiorari. 550 U. S. 917 (2007).

## II

Medellín first contends that the ICJ's judgment in *Avena* constitutes a "binding" obligation on the state and federal courts of the United States. He argues that "by virtue of the Supremacy Clause, the treaties requiring compliance with the *Avena* judgment are *already* the 'Law of the Land' by which all state and federal courts in this country are 'bound.'" Reply Brief for Petitioner 1. Accordingly, Medellín argues, *Avena* is a binding federal rule of decision that pre-empts contrary state limitations on successive habeas petitions.

No one disputes that the *Avena* decision—a decision that flows from the treaties through which the United States submitted to ICJ jurisdiction with respect to Vienna Convention disputes—constitutes an *international* law obligation on the part of the United States. But not all international law obligations automatically constitute binding federal law enforceable in United States courts. The question we confront here is whether the *Avena* judgment has automatic *domestic* legal effect such that the judgment of its own force applies in state and federal courts.

This Court has long recognized the distinction between treaties that automatically have effect as domestic law, and those that—while they constitute international law commitments—do not by themselves function as binding federal law. The distinction was well explained by Chief Justice Marshall's opinion in *Foster* v. *Neilson*, 2 Pet. 253, 315 (1829),

overruled on other grounds, *United States* v. *Percheman*, 7 Pet. 51 (1833), which held that a treaty is "equivalent to an act of the legislature," and hence self-executing, when it "operates of itself without the aid of any legislative provision." *Foster, supra,* at 314. When, in contrast, "[treaty] stipulations are not self-executing they can only be enforced pursuant to legislation to carry them into effect." *Whitney* v. *Robertson,* 124 U. S. 190, 194 (1888). In sum, while treaties "may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms." *Igartúa-De La Rosa* v. *United States,* 417 F. 3d 145, 150 (CA1 2005) (en banc) (Boudin, C. J.).[2]

A treaty is, of course, "primarily a compact between independent nations." *Head Money Cases,* 112 U. S. 580, 598 (1884). It ordinarily "depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it." *Ibid.*; see also The Federalist No. 33, p. 207 (J. Cooke ed. 1961) (A. Hamilton) (comparing laws that individuals are "bound to observe" as "the *supreme law* of the land" with "a mere treaty, dependent on the good faith of the parties"). "If these [interests] fail, its infraction becomes the subject of international negotiations and reclamations . . . . It is obvious that with all this the judicial courts have nothing to do and can give no redress." *Head Money Cases, supra,* at 598. Only "[i]f the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, [will] they have the force

---

[2] The label "self-executing" has on occasion been used to convey different meanings. What we mean by "self-executing" is that the treaty has automatic domestic effect as federal law upon ratification. Conversely, a "non-self-executing" treaty does not by itself give rise to domestically enforceable federal law. Whether such a treaty has domestic effect depends upon implementing legislation passed by Congress.

and effect of a legislative enactment." *Whitney, supra,* at 194.[3]

Medellín and his *amici* nonetheless contend that the Optional Protocol, U. N. Charter, and ICJ Statute supply the "relevant obligation" to give the *Avena* judgment binding effect in the domestic courts of the United States. Reply Brief for Petitioner 5–6.[4] Because none of these treaty sources creates binding federal law in the absence of implementing legislation, and because it is uncontested that no such legislation exists, we conclude that the *Avena* judgment is not automatically binding domestic law.

## A

The interpretation of a treaty, like the interpretation of a statute, begins with its text. *Air France* v. *Saks,* 470

---

[3] Even when treaties are self-executing in the sense that they create federal law, the background presumption is that "[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts." 2 Restatement (Third) of Foreign Relations Law of the United States § 907, Comment *a,* p. 395 (1986) (hereinafter Restatement). Accordingly, a number of the Courts of Appeals have presumed that treaties do not create privately enforceable rights in the absence of express language to the contrary. See, *e. g., United States* v. *Emuegbunam,* 268 F. 3d 377, 389 (CA6 2001); *United States* v. *Jimenez-Nava,* 243 F. 3d 192, 195 (CA5 2001); *United States* v. *Li,* 206 F. 3d 56, 60–61 (CA1 2000) (en banc); *Goldstar (Panama) S. A.* v. *United States,* 967 F. 2d 965, 968 (CA4 1992); *Canadian Transp. Co.* v. *United States,* 663 F. 2d 1081, 1092 (CADC 1980); *Mannington Mills, Inc.* v. *Congoleum Corp.,* 595 F. 2d 1287, 1298 (CA3 1979).

[4] The question is whether the *Avena* judgment has binding effect in domestic courts under the Optional Protocol, ICJ Statute, and U. N. Charter. Consequently, it is unnecessary to resolve whether the Vienna Convention is itself "self-executing" or whether it grants Medellín individually enforceable rights. See Reply Brief for Petitioner 5 (disclaiming reliance on the Vienna Convention). As in *Sanchez-Llamas,* 548 U. S., at 342–343, we thus assume, without deciding, that Article 36 grants foreign nationals "an individually enforceable right to request that their consular officers be notified of their detention, and an accompanying right to be informed by authorities of the availability of consular notification."

U. S. 392, 396–397 (1985). Because a treaty ratified by the United States is "an agreement among sovereign powers," we have also considered as "aids to its interpretation" the negotiation and drafting history of the treaty as well as "the postratification understanding" of signatory nations. *Zicherman* v. *Korean Air Lines Co.,* 516 U. S. 217, 226 (1996); see also *United States* v. *Stuart,* 489 U. S. 353, 365– 366 (1989); *Choctaw Nation* v. *United States,* 318 U. S. 423, 431–432 (1943).

As a signatory to the Optional Protocol, the United States agreed to submit disputes arising out of the Vienna Convention to the ICJ. The Protocol provides: "Disputes arising out of the interpretation or application of the [Vienna] Convention shall lie within the compulsory jurisdiction of the International Court of Justice." Art. I, 21 U. S. T., at 326. Of course, submitting to jurisdiction and agreeing to be bound are two different things. A party could, for example, agree to compulsory nonbinding arbitration. Such an agreement would require the party to appear before the arbitral tribunal without obligating the party to treat the tribunal's decision as binding. See, *e. g.,* North American Free Trade Agreement, U. S.-Can.-Mex., Art. 2018(1), Dec. 17, 1992, 32 I. L. M. 605, 697 (1993) ("On receipt of the final report of [the arbitral panel requested by a Party to the agreement], the disputing Parties shall agree on the resolution of the dispute, which normally shall conform with the determinations and recommendations of the panel").

The most natural reading of the Optional Protocol is as a bare grant of jurisdiction. It provides only that "[d]isputes arising out of the interpretation or application of the [Vienna] Convention shall lie within the compulsory jurisdiction of the International Court of Justice" and "may accordingly be brought before the [ICJ] . . . by any party to the dispute being a Party to the present Protocol." Art. I, 21 U. S. T., at 326. The Protocol says nothing about the effect of an ICJ decision and does not itself commit signatories to

comply with an ICJ judgment. The Protocol is similarly silent as to any enforcement mechanism.

The obligation on the part of signatory nations to comply with ICJ judgments derives not from the Optional Protocol, but rather from Article 94 of the U. N. Charter—the provision that specifically addresses the effect of ICJ decisions. Article 94(1) provides that "[e]ach Member of the United Nations *undertakes to comply* with the decision of the [ICJ] in any case to which it is a party." 59 Stat. 1051 (emphasis added). The Executive Branch contends that the phrase "undertakes to comply" is not "an acknowledgement that an ICJ decision will have immediate legal effect in the courts of U. N. members," but rather "a *commitment* on the part of U. N. members to take *future* action through their political branches to comply with an ICJ decision." Brief for United States as *Amicus Curiae* in *Medellín I*, O. T. 2004, No. 04–5928, p. 34.

We agree with this construction of Article 94. The Article is not a directive to domestic courts. It does not provide that the United States "shall" or "must" comply with an ICJ decision, nor indicate that the Senate that ratified the U. N. Charter intended to vest ICJ decisions with immediate legal effect in domestic courts. Instead, "[t]he words of Article 94 . . . call upon governments to take certain action." *Committee of United States Citizens Living in Nicaragua* v. *Reagan*, 859 F. 2d 929, 938 (CADC 1988) (quoting *Diggs* v. *Richardson*, 555 F. 2d 848, 851 (CADC 1976); internal quotation marks omitted). See also *Foster*, 2 Pet., at 314, 315 (holding a treaty non-self-executing because its text— " 'all . . . grants of land . . . shall be ratified and confirmed' "— did not "act directly on the grants" but rather "pledge[d] the faith of the United States to pass acts which shall ratify and confirm them"). In other words, the U. N. Charter reads like "a compact between independent nations" that "depends for the enforcement of its provisions on the interest and the

honor of the governments which are parties to it." *Head Money Cases*, 112 U. S., at 598.[5]

The remainder of Article 94 confirms that the U. N. Charter does not contemplate the automatic enforceability of ICJ decisions in domestic courts.[6] Article 94(2)—the enforcement provision—provides the sole remedy for noncompliance: referral to the United Nations Security Council by an aggrieved state. 59 Stat. 1051.

The U. N. Charter's provision of an express diplomatic—that is, nonjudicial—remedy is itself evidence that ICJ judgments were not meant to be enforceable in domestic courts. See *Sanchez-Llamas*, 548 U. S., at 347. And even this "quintessentially *international* remed[y]," *id.*, at 355, is not absolute. First, the Security Council must "dee[m] necessary" the issuance of a recommendation or measure to effectuate the judgment. Art. 94(2), 59 Stat. 1051. Second, as the President and Senate were undoubtedly aware in subscribing to the U. N. Charter and Optional Protocol, the

_____

[5] We do not read "undertakes" to mean that " " "[t]he United States . . . shall be at liberty to make respecting th[e] matter, such laws as they think proper." " " *Post*, at 554 (BREYER, J., dissenting) (quoting *Todok* v. *Union State Bank of Harvard*, 281 U. S. 449, 453, 454 (1930) (holding that a treaty with Norway did *not* "operat[e] to override the law of [Nebraska] as to the disposition of homestead property")). Whether or not the United States "undertakes" to comply with a treaty says nothing about what laws it may enact. The United States is *always* "at liberty to make . . . such laws as [it] think[s] proper." *Id.*, at 453. Indeed, a later-in-time federal statute supersedes inconsistent treaty provisions. See, *e. g., Cook* v. *United States*, 288 U. S. 102, 119–120 (1933). Rather, the "undertakes to comply" language confirms that further action to give effect to an ICJ judgment was contemplated, contrary to the dissent's position that such judgments constitute directly enforceable federal law, without more. See also *post*, at 533–535 (STEVENS, J., concurring in judgment).

[6] Article 94(2) provides in full: "If any party to a case fails to perform the obligations incumbent upon it under a judgment rendered by the Court, the other party may have recourse to the Security Council, which may, if it deems necessary, make recommendations or decide upon measures to be taken to give effect to the judgment." 59 Stat. 1051.

United States retained the unqualified right to exercise its veto of any Security Council resolution.

This was the understanding of the Executive Branch when the President agreed to the U. N. Charter and the declaration accepting general compulsory ICJ jurisdiction. See, e. g., The Charter of the United Nations for the Maintenance of International Peace and Security: Hearings before the Senate Committee on Foreign Relations, 79th Cong., 1st Sess., 124–125 (1945) ("[I]f a state fails to perform its obligations under a judgment of the [ICJ], the other party may have recourse to the Security Council"); id., at 286 (statement of Leo Pasvolsky, Special Assistant to the Secretary of State for International Organizations and Security Affairs) ("[W]hen the Court has rendered a judgment and one of the parties refuses to accept it, then the dispute becomes political rather than legal. It is as a political dispute that the matter is referred to the Security Council"); A Resolution Proposing Acceptance of Compulsory Jurisdiction of International Court of Justice: Hearings on S. Res. 196 before the Subcommittee of the Senate Committee on Foreign Relations, 79th Cong., 2d Sess., 142 (1946) (statement of Charles Fahy, State Dept. Legal Adviser) (while parties that accept ICJ jurisdiction have "a moral obligation" to comply with ICJ decisions, Article 94(2) provides the exclusive means of enforcement).

If ICJ judgments were instead regarded as automatically enforceable domestic law, they would be immediately and directly binding on state and federal courts pursuant to the Supremacy Clause. Mexico or the ICJ would have no need to proceed to the Security Council to enforce the judgment in this case. Noncompliance with an ICJ judgment through exercise of the Security Council veto—always regarded as an option by the Executive and ratifying Senate during and after consideration of the U. N. Charter, Optional Protocol, and ICJ Statute—would no longer be a viable alternative.

There would be nothing to veto. In light of the U. N. Charter's remedial scheme, there is no reason to believe that the President and Senate signed up for such a result.

In sum, Medellín's view that ICJ decisions are automatically enforceable as domestic law is fatally undermined by the enforcement structure established by Article 94. His construction would eliminate the option of noncompliance contemplated by Article 94(2), undermining the ability of the political branches to determine whether and how to comply with an ICJ judgment. Those sensitive foreign policy decisions would instead be transferred to state and federal courts charged with applying an ICJ judgment directly as domestic law. And those courts would not be empowered to decide whether to comply with the judgment—again, always regarded as an option by the political branches—any more than courts may consider whether to comply with any other species of domestic law. This result would be particularly anomalous in light of the principle that "[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments." *Oetjen* v. *Central Leather Co.*, 246 U. S. 297, 302 (1918).

The ICJ Statute, incorporated into the U. N. Charter, provides further evidence that the ICJ's judgment in *Avena* does not automatically constitute federal law judicially enforceable in United States courts. Art. 59, 59 Stat. 1062. To begin with, the ICJ's "principal purpose" is said to be to "arbitrate particular disputes between national governments." *Sanchez-Llamas, supra,* at 355 (citing 59 Stat. 1055). Accordingly, the ICJ can hear disputes only between nations, not individuals. Art. 34(1), *id.,* at 1059 ("Only states [*i. e.,* countries] may be parties in cases before the [ICJ]"). More important, Article 59 of the statute provides that "[t]he decision of the [ICJ] has *no binding force* except between the parties and in respect of that particular case."

*Id.*, at 1062 (emphasis added).[7] The dissent does not explain how Medellín, an individual, can be a party to the ICJ proceeding.

Medellín argues that because the *Avena* case involves him, it is clear that he—and the 50 other Mexican nationals named in the *Avena* decision—should be regarded as parties to the *Avena* judgment. Brief for Petitioner 21–22. But cases before the ICJ are often precipitated by disputes involving particular persons or entities, disputes that a nation elects to take up as its own. See, *e. g., Case Concerning the Barcelona Traction, Light & Power Co. (Belg. v. Spain)*, 1970 I. C. J. 3 (Judgment of Feb. 5) (claim brought by Belgium on behalf of Belgian nationals and shareholders); *Case Concerning the Protection of French Nationals and Protected Persons in Egypt (Fr. v. Egypt)*, 1950 I. C. J. 59 (Order of Mar. 29) (claim brought by France on behalf of French nationals and protected persons in Egypt); *Anglo-Iranian Oil Co. Case (U. K. v. Iran)*, 1952 I. C. J. 93, 112 (Judgment of July 22) (claim brought by the United Kingdom on behalf of the Anglo-Iranian Oil Company). That has never been understood to alter the express and established rules that only nation-states may be parties before the ICJ, Art. 34, 59 Stat. 1059, and—contrary to the position of the dissent, *post*, at 559—that ICJ judgments are binding only between those parties, Art. 59, 59 Stat. 1062.[8]

---

[7] Medellín alters this language in his brief to provide that the ICJ Statute makes the *Avena* judgment binding "in respect of [his] particular case." Brief for Petitioner 22 (internal quotation marks omitted). Medellín does not and cannot have a case before the ICJ under the terms of the ICJ Statute.

[8] The dissent concludes that the ICJ judgment is binding federal law based in large part on its belief that the Vienna Convention overrides contrary state procedural rules. See *post*, at 555–557, 559. But not even Medellín relies on the Convention. See Reply Brief for Petitioner 5 (disclaiming reliance). For good reason: Such reliance is foreclosed by the decision of this Court in *Sanchez-Llamas*, 548 U. S., at 351 (holding that

It is, moreover, well settled that the United States' interpretation of a treaty "is entitled to great weight." *Sumitomo Shoji America, Inc.* v. *Avagliano,* 457 U. S. 176, 184–185 (1982); see also *El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng,* 525 U. S. 155, 168 (1999). The Executive Branch has unfailingly adhered to its view that the relevant treaties do not create domestically enforceable federal law. See Brief for United States as *Amicus Curiae* 4, 27–29.[9]

The pertinent international agreements, therefore, do not provide for implementation of ICJ judgments through direct enforcement in domestic courts, and "where a treaty does not provide a particular remedy, either expressly or implicitly, it

---

the Convention does not preclude the application of state procedural bars); see also *id.,* at 363 (GINSBURG, J., concurring in judgment). There is no basis for relitigating the issue. Further, to rely on the Convention would elide the distinction between a treaty—negotiated by the President and signed by Congress—and a judgment rendered pursuant to those treaties.

[9] In interpreting our treaty obligations, we also consider the views of the ICJ itself, "giv[ing] respectful consideration to the interpretation of an international treaty rendered by an international court with jurisdiction to interpret [the treaty]." *Breard* v. *Greene,* 523 U. S. 371, 375 (1998) (*per curiam*); see *Sanchez-Llamas, supra,* at 355–356. It is not clear whether that principle would apply when the question is the binding force of ICJ judgments themselves, rather than the substantive scope of a treaty the ICJ must interpret in resolving disputes. Cf. *Phillips Petroleum Co.* v. *Shutts,* 472 U. S. 797, 805 (1985) ("[A] court adjudicating a dispute may not be able to predetermine the res judicata effect of its own judgment"); 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4405, p. 82 (2d ed. 2002) ("The first court does not get to dictate to other courts the preclusion consequences of its own judgment"). In any event, nothing suggests that the ICJ views its judgments as automatically enforceable in the domestic courts of signatory nations. The *Avena* judgment itself directs the United States to provide review and reconsideration of the affected convictions and sentences "*by means of its own choosing.*" 2004 I. C. J., at 72, ¶ 153(9) (emphasis added). This language, as well as the ICJ's mere suggestion that the "judicial process" is best suited to provide such review, *id.,* at 65–66, confirm that domestic enforceability in court is not part and parcel of an ICJ judgment.

is not for the federal courts to impose one on the States through lawmaking of their own." *Sanchez-Llamas,* 548 U. S., at 347.

## B

The dissent faults our analysis because it "looks for the wrong thing (explicit textual expression about self-execution) using the wrong standard (clarity) in the wrong place (the treaty language)." *Post,* at 562. Given our obligation to interpret treaty provisions to determine whether they are self-executing, we have to confess that we do think it rather important to look to the treaty language to see what it has to say about the issue. That is after all what the Senate looks to in deciding whether to approve the treaty.

The interpretive approach employed by the Court today—resorting to the text—is hardly novel. In two early cases involving an 1819 land-grant treaty between Spain and the United States, Chief Justice Marshall found the language of the treaty dispositive. In *Foster,* after distinguishing between self-executing treaties (those "equivalent to an act of the legislature") and non-self-executing treaties (those "the legislature must execute"), Chief Justice Marshall held that the 1819 treaty was non-self-executing. 2 Pet., at 314. Four years later, the Supreme Court considered another claim under the same treaty, but concluded that the treaty was self-executing. See *Percheman,* 7 Pet., at 87. The reason was not because the treaty was sometimes self-executing and sometimes not, but because "the language of" the Spanish translation (brought to the Court's attention for the first time) indicated the parties' intent to ratify and confirm the land grant "by force of the instrument itself." *Id.,* at 89.

As against this time-honored textual approach, the dissent proposes a multifactor, judgment-by-judgment analysis that would "jettiso[n] relative predictability for the open-ended rough-and-tumble of factors." *Jerome B. Grubart, Inc.* v. *Great Lakes Dredge & Dock Co.,* 513 U. S. 527, 547 (1995).

The dissent's novel approach to deciding which (or, more accurately, when) treaties give rise to directly enforceable federal law is arrestingly indeterminate. Treaty language is barely probative. *Post,* at 549 ("[T]he absence or presence of language in a treaty about a provision's self-execution proves nothing at all"). Determining whether treaties themselves create federal law is sometimes committed to the political branches and sometimes to the judiciary. *Post,* at 549–550. Of those committed to the judiciary, the courts pick and choose which shall be binding United States law—trumping not only state but other federal law as well—and which shall not. *Post,* at 550–562. They do this on the basis of a multifactor, "context-specific" inquiry. *Post,* at 549. Even then, the same treaty sometimes gives rise to United States law and sometimes does not, again depending on an ad hoc judicial assessment. *Post,* at 550–562.

Our Framers established a careful set of procedures that must be followed before federal law can be created under the Constitution—vesting that decision in the political branches, subject to checks and balances. U. S. Const., Art. I, § 7. They also recognized that treaties could create federal law, but again through the political branches, with the President making the treaty and the Senate approving it. Art. II, § 2. The dissent's understanding of the treaty route, depending on an ad hoc judgment of the judiciary without looking to the treaty language—the very language negotiated by the President and approved by the Senate—cannot readily be ascribed to those same Framers.

The dissent's approach risks the United States' involvement in international agreements. It is hard to believe that the United States would enter into treaties that are sometimes enforceable and sometimes not. Such a treaty would be the equivalent of writing a blank check to the judiciary. Senators could never be quite sure what the treaties on which they were voting meant. Only a judge could say for sure and only at some future date. This uncertainty could

hobble the United States' efforts to negotiate and sign international agreements.

In this case, the dissent—for a grab bag of no less than seven reasons—would tell us that this *particular* ICJ judgment is federal law. *Post,* at 549–562. That is no sort of guidance. Nor is it any answer to say that the federal courts will diligently police international agreements and enforce the decisions of international tribunals only when they *should be* enforced. *Ibid.* The point of a non-self-executing treaty is that it "addresses itself to the political, *not* the judicial department; and the legislature must execute the contract before it can become a rule for the Court." *Foster, supra,* at 314 (emphasis added); *Whitney,* 124 U. S., at 195. See also *Foster, supra,* at 307 ("The judiciary is not that department of the government, to which the assertion of its interests against foreign powers is confided"). The dissent's contrary approach would assign to the courts—not the political branches—the primary role in deciding when and how international agreements will be enforced. To read a treaty so that it sometimes has the effect of domestic law and sometimes does not is tantamount to vesting with the judiciary the power not only to interpret but also to create the law.

## C

Our conclusion that *Avena* does not by itself constitute binding federal law is confirmed by the "postratification understanding" of signatory nations. See *Zicherman,* 516 U. S., at 226. There are currently 47 nations that are parties to the Optional Protocol and 171 nations that are parties to the Vienna Convention. Yet neither Medellín nor his *amici* have identified a single nation that treats ICJ judgments as binding in domestic courts.[10] In determining that the

---

[10] The best that the ICJ experts as *amici curiae* can come up with is the contention that local Moroccan courts have referred to ICJ judgments as "dispositive." Brief for ICJ Experts as *Amici Curiae* 20, n. 31. Even the ICJ experts do not cite a case so holding, and Moroccan practice is at

Vienna Convention did not require certain relief in United States courts in *Sanchez-Llamas,* we found it pertinent that the requested relief would not be available under the treaty in any other signatory country. See 548 U. S., at 343–344, and n. 3. So too here the lack of any basis for supposing that any other country would treat ICJ judgments as directly enforceable as a matter of its domestic law strongly suggests that the treaty should not be so viewed in our courts.

Our conclusion is further supported by general principles of interpretation. To begin with, we reiterated in *Sanchez-Llamas* what we held in *Breard,* that " 'absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of the treaty in that State.' " 548 U. S., at 351 (quoting *Breard,* 523 U. S., at 375). Given that ICJ judgments may interfere with state procedural rules, one would expect the ratifying parties to the relevant treaties to have clearly stated their intent to give those judgments domestic effect, if they had so intended. Here there is no statement in the Optional Protocol, the U. N. Charter, or the ICJ Statute that supports the notion that ICJ judgments displace state procedural rules.

Moreover, the consequences of Medellín's argument give pause. An ICJ judgment, the argument goes, is not only binding domestic law but is also unassailable. As a result, neither Texas nor this Court may look behind a judgment and quarrel with its reasoning or result. (We already know, from *Sanchez-Llamas,* that this Court disagrees with both

best inconsistent, for at least one local Moroccan court has held that ICJ judgments are not binding as a matter of municipal law. See, *e. g., Mackay Radio & Tel. Co.* v. *Lal-La Fatma Bent si Mohamed el Khadar,* [1954] 21 Int'l L. Rep. 136 (Tangier, Ct. App. Int'l Trib.) (holding that ICJ decisions are not binding on Morocco's domestic courts); see also *"Socobel"* v. *Greek State,* [1951] 18 Int'l L. Rep. 3 (Belg., Trib. Civ. de Bruxelles) (holding that judgments of the ICJ's predecessor, the Permanent Court of International Justice, were not domestically enforceable).

the reasoning and result in *Avena.*) Medellín's interpretation would allow ICJ judgments to override otherwise binding state law; there is nothing in his logic that would exempt contrary federal law from the same fate. See, *e. g., Cook* v. *United States,* 288 U. S. 102, 119 (1933) (later-in-time self-executing treaty supersedes a federal statute if there is a conflict). And there is nothing to prevent the ICJ from ordering state courts to annul criminal convictions and sentences, for any reason deemed sufficient by the ICJ. Indeed, that is precisely the relief Mexico requested. *Avena,* 2004 I. C. J., at 58–59.

Even the dissent flinches at reading the relevant treaties to give rise to self-executing ICJ judgments in all cases. It admits that "Congress is unlikely to authorize automatic judicial enforceability of *all* ICJ judgments, for that could include some politically sensitive judgments and others better suited for enforcement by other branches." *Post,* at 560. Our point precisely. But the lesson to draw from that insight is hardly that the judiciary should decide which judgments are politically sensitive and which are not.

In short, and as we observed in *Sanchez-Llamas,* "[n]othing in the structure or purpose of the ICJ suggests that its interpretations were intended to be conclusive on our courts." 548 U. S., at 354. Given that holding, it is difficult to see how that same structure and purpose can establish, as Medellín argues, that *judgments* of the ICJ nonetheless were intended to be conclusive on our courts. A judgment is binding only if there is a rule of law that makes it so. And the question whether ICJ judgments can bind domestic courts depends upon the same analysis undertaken in *Sanchez-Llamas* and set forth above.

Our prior decisions identified by the dissent as holding a number of treaties to be self-executing, see *post,* at 545–546, and Appendix A, stand only for the unremarkable proposition that some international agreements are self-executing and others are not. It is well settled that the "[i]nterpreta-

tion of [a treaty] . . . must, of course, begin with the language of the Treaty itself." *Sumitomo Shoji America, Inc.*, 457 U. S., at 180. As a result, we have held treaties to be self-executing when the textual provisions indicate that the President and Senate intended for the agreement to have domestic effect.

Medellín and the dissent cite *Comegys* v. *Vasse*, 1 Pet. 193 (1828), for the proposition that the judgments of international tribunals are automatically binding on domestic courts. See *post*, at 546; Reply Brief for Petitioner 2; Brief for Petitioner 19–20. That case, of course, involved a different treaty than the ones at issue here; it stands only for the modest principle that the terms of a treaty control the outcome of a case.[11] We do not suggest that treaties can never afford binding domestic effect to international tribunal judgments—only that the U. N. Charter, the Optional Protocol, and the ICJ Statute do not do so. And whether the treaties underlying a judgment are self-executing so that the judgment is directly enforceable as domestic law in our courts is, of course, a matter for this Court to decide. See *Sanchez-Llamas, supra*, at 353–354.

## D

Our holding does not call into question the ordinary enforcement of foreign judgments or international arbitral

---

[11] The other case Medellín cites for the proposition that the judgments of international courts are binding, *La Abra Silver Mining Co.* v. *United States*, 175 U. S. 423 (1899), and the cases he cites for the proposition that this Court has routinely enforced treaties under which foreign nationals have asserted rights, similarly stand only for the principle that the terms of a treaty govern its enforcement. See Reply Brief for Petitioner 4, 5, and n. 2. In each case, this Court first interpreted the treaty prior to finding it domestically enforceable. See, *e. g., United States* v. *Rauscher*, 119 U. S. 407, 422–423 (1886) (holding that the treaty required extradition only for specified offenses); *Hopkirk* v. *Bell*, 3 Cranch 454, 458 (1806) (holding that the treaty of peace between Great Britain and the United States prevented the operation of a state statute of limitations on British debts).

agreements. Indeed, we agree with Medellín that, as a general matter, "an agreement to abide by the result" of an international adjudication—or what he really means, an agreement to give the result of such adjudication domestic legal effect—can be a treaty obligation like any other, so long as the agreement is consistent with the Constitution. See Brief for Petitioner 20. The point is that the particular treaty obligations on which Medellín relies do not of their own force create domestic law.

The dissent worries that our decision casts doubt on some 70-odd treaties under which the United States has agreed to submit disputes to the ICJ according to "roughly similar" provisions. See *post*, at 540–541, 552–553. Again, under our established precedent, some treaties are self-executing and some are not, depending on the treaty. That the judgment of an international tribunal might not automatically become domestic law hardly means the underlying treaty is "useless." See *post*, at 553; cf. *post*, at 548 (describing the British system in which treaties "virtually always requir[e] parliamentary legislation"). Such judgments would still constitute international obligations, the proper subject of political and diplomatic negotiations. See *Head Money Cases*, 112 U. S., at 598. And Congress could elect to give them wholesale effect (rather than the judgment-by-judgment approach hypothesized by the dissent, *post*, at 560) through implementing legislation, as it regularly has. See, *e. g.*, Foreign Affairs Reform and Restructuring Act of 1998, §2242, 112 Stat. 2681–822, note following 8 U. S. C. §1231 (directing the "appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3" of the Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment); see also *infra*, at 521–522 (listing examples of legislation implementing international obligations).

Further, that an ICJ judgment may not be automatically enforceable in domestic courts does not mean the particular

underlying treaty is not. Indeed, we have held that a number of the "Friendship, Commerce, and Navigation" Treaties cited by the dissent, see Appendix B, *post*, are self-executing—based on "the language of the[se] Treat[ies]." See *Sumitomo Shoji America, Inc.*, *supra*, at 180, 189–190. In *Kolovrat* v. *Oregon*, 366 U. S. 187, 191, 196 (1961), for example, the Court found that Yugoslavian claimants denied inheritance under Oregon law were entitled to inherit personal property pursuant to an 1881 Treaty of Friendship, Navigation, and Commerce between the United States and Serbia. See also *Clark* v. *Allen*, 331 U. S. 503, 507–511, 517–518 (1947) (finding that the right to inherit real property granted German aliens under the Treaty of Friendship, Commerce and Consular Rights with Germany prevailed over California law). Contrary to the dissent's suggestion, see *post*, at 547, neither our approach nor our cases require that a treaty provide for self-execution in so many talismanic words; that is a caricature of the Court's opinion. Our cases simply require courts to decide whether a treaty's terms reflect a determination by the President who negotiated it and the Senate that confirmed it that the treaty has domestic effect.

In addition, Congress is up to the task of implementing non-self-executing treaties, even those involving complex commercial disputes. Cf. *post*, at 560 (BREYER, J., dissenting). The judgments of a number of international tribunals enjoy a different status because of implementing legislation enacted by Congress. See, *e. g.*, 22 U. S. C. § 1650a(a) ("An award of an arbitral tribunal rendered pursuant to chapter IV of the [Convention on the Settlement of Investment Disputes] shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States"); 9 U. S. C. §§ 201–208 ("The [U. N.] Convention on the Recogni-

tion and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter," § 201). Such language demonstrates that Congress knows how to accord domestic effect to international obligations when it desires such a result.[12]

Further, Medellín frames his argument as though giving the *Avena* judgment binding effect in domestic courts simply conforms to the proposition that domestic courts generally give effect to foreign judgments. But Medellín does not ask us to enforce a foreign-court judgment settling a typical commercial or property dispute. See, *e. g.*, *Hilton* v. *Guyot*, 159 U. S. 113 (1895); *United States* v. *Arredondo*, 6 Pet. 691 (1832); see also Uniform Foreign Money-Judgments Recognition Act § 1(2), 13 U. L. A., pt. 2, p. 44 (2002) ("'[F]oreign judgment' means any judgment of a foreign state granting or denying recovery of a sum of money"). Rather, Medellín argues that the *Avena* judgment has the effect of enjoining the operation of state law. What is more, on Medellín's view, the judgment would force the State to take action to "review and reconside[r]" his case. The general rule, however, is that judgments of foreign courts awarding injunctive relief, even as to private parties, let alone sovereign States, "are not generally entitled to enforcement." See 1 Restatement § 481, Comment *b*, at 595.

In sum, while the ICJ's judgment in *Avena* creates an international law obligation on the part of the United States, it does not of its own force constitute binding federal law

---

[12] That this Court has rarely had occasion to find a treaty non-self-executing is not all that surprising. See *post*, at 545 (BREYER, J., dissenting). To begin with, the Courts of Appeals have regularly done so. See, *e. g.*, *Pierre* v. *Gonzales*, 502 F. 3d 109, 119–120 (CA2 2007) (holding that the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment is non-self-executing); *Singh* v. *Ashcroft*, 398 F. 3d 396, 404, n. 3 (CA6 2005) (same); *Beazley* v. *Johnson*, 242 F. 3d 248, 267 (CA5 2001) (holding that the International Covenant on Civil and Political Rights is non-self-executing). Further, as noted, Congress has not hesitated to pass implementing legislation for treaties that in its view require such legislation.

that pre-empts state restrictions on the filing of successive habeas petitions. As we noted in *Sanchez-Llamas*, a contrary conclusion would be extraordinary, given that basic rights guaranteed by our own Constitution do not have the effect of displacing state procedural rules. See 548 U. S., at 360. Nothing in the text, background, negotiating and drafting history, or practice among signatory nations suggests that the President or Senate intended the improbable result of giving the judgments of an international tribunal a higher status than that enjoyed by "many of our most fundamental constitutional protections." *Ibid.*

### III

Medellín next argues that the ICJ's judgment in *Avena* is binding on state courts by virtue of the President's February 28, 2005 Memorandum. The United States contends that while the *Avena* judgment does not of its own force require domestic courts to set aside ordinary rules of procedural default, that judgment became the law of the land with precisely that effect pursuant to the President's Memorandum and his power "to establish binding rules of decision that preempt contrary state law." Brief for United States as *Amicus Curiae* 5. Accordingly, we must decide whether the President's declaration alters our conclusion that the *Avena* judgment is not a rule of domestic law binding in state and federal courts.[13]

### A

The United States maintains that the President's constitutional role "uniquely qualifies" him to resolve the sensitive

---

[13] The dissent refrains from deciding the issue, but finds it "difficult to believe that in the exercise of his Article II powers pursuant to a ratified treaty, the President can *never* take action that would result in setting aside state law." *Post*, at 564. We agree. The questions here are the far more limited ones of whether he may unilaterally create federal law by giving effect to the judgment of this international tribunal pursuant to this non-self-executing treaty, and, if not, whether he may rely on other authority under the Constitution to support the action taken in this particular case. Those are the only questions we decide.

foreign policy decisions that bear on compliance with an ICJ decision and "to do so expeditiously." Brief for United States as *Amicus Curiae* 11, 12. We do not question these propositions. See, *e. g., First Nat. City Bank* v. *Banco Nacional de Cuba*, 406 U. S. 759, 767 (1972) (plurality opinion) (The President has "the lead role . . . in foreign policy"); *American Ins. Assn.* v. *Garamendi*, 539 U. S. 396, 414 (2003) (Article II of the Constitution places with the President the "'vast share of responsibility for the conduct of our foreign relations'" (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 610–611 (1952) (Frankfurter, J., concurring))). In this case, the President seeks to vindicate United States interests in ensuring the reciprocal observance of the Vienna Convention, protecting relations with foreign governments, and demonstrating commitment to the role of international law. These interests are plainly compelling.

Such considerations, however, do not allow us to set aside first principles. The President's authority to act, as with the exercise of any governmental power, "must stem either from an act of Congress or from the Constitution itself." *Youngstown, supra,* at 585; *Dames & Moore* v. *Regan*, 453 U. S. 654, 668 (1981).

Justice Jackson's familiar tripartite scheme provides the accepted framework for evaluating executive action in this area. First, "[w]hen the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U. S., at 635 (concurring opinion). Second, "[w]hen the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.,* at 637. In this circumstance, Presidential authority can derive support from "congressional inertia, indifference or quiescence." *Ibid.*

Finally, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb," and the Court can sustain his actions "only by disabling the Congress from acting upon the subject." *Id.*, at 637–638.

### B

The United States marshals two principal arguments in favor of the President's authority "to establish binding rules of decision that preempt contrary state law." Brief for United States as *Amicus Curiae* 5. The Solicitor General first argues that the relevant treaties give the President the authority to implement the *Avena* judgment and that Congress has acquiesced in the exercise of such authority. The United States also relies upon an "independent" international dispute-resolution power wholly apart from the asserted authority based on the pertinent treaties. Medellín adds the additional argument that the President's Memorandum is a valid exercise of his power to take care that the laws be faithfully executed.

### 1

The United States maintains that the President's Memorandum is authorized by the Optional Protocol and the U. N. Charter. Brief for United States as *Amicus Curiae* 9. That is, because the relevant treaties "create an obligation to comply with *Avena*," they "*implicitly* give the President authority to implement that treaty-based obligation." *Id.*, at 11 (emphasis added). As a result, the President's Memorandum is well grounded in the first category of the *Youngstown* framework.

We disagree. The President has an array of political and diplomatic means available to enforce international obligations, but unilaterally converting a non-self-executing treaty into a self-executing one is not among them. The responsibility for transforming an international obligation arising from a non-self-executing treaty into domestic law falls to

Congress. *Foster*, 2 Pet., at 315; *Whitney*, 124 U. S., at 194; *Igartúa-De La Rosa*, 417 F. 3d, at 150. As this Court has explained, when treaty stipulations are "not self-executing they can only be enforced pursuant to legislation to carry them into effect." *Whitney, supra*, at 194. Moreover, "[u]ntil such act shall be passed, the Court is not at liberty to disregard the existing laws on the subject." *Foster, supra*, at 315.

The requirement that Congress, rather than the President, implement a non-self-executing treaty derives from the text of the Constitution, which divides the treaty-making power between the President and the Senate. The Constitution vests the President with the authority to "make" a treaty. Art. II, §2. If the Executive determines that a treaty should have domestic effect of its own force, that determination may be implemented in "mak[ing]" the treaty, by ensuring that it contains language plainly providing for domestic enforceability. If the treaty is to be self-executing in this respect, the Senate must consent to the treaty by the requisite two-thirds vote, *ibid.*, consistent with all other constitutional restraints.

Once a treaty is ratified without provisions clearly according it domestic effect, however, whether the treaty will ever have such effect is governed by the fundamental constitutional principle that "'[t]he power to make the necessary laws is in Congress; the power to execute in the President.'" *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 591 (2006) (quoting *Ex parte Milligan*, 4 Wall. 2, 139 (1866) (opinion of Chase, C. J.)); see U. S. Const., Art. I, §1 ("All legislative Powers herein granted shall be vested in a Congress of the United States"). As already noted, the terms of a non-self-executing treaty can become domestic law only in the same way as any other law—through passage of legislation by both Houses of Congress, combined with either the President's signature or a congressional override of a Presidential veto. See Art. I, §7. Indeed, "the President's power to see that

the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U. S., at 587.

A non-self-executing treaty, by definition, is one that was ratified with the understanding that it is not to have domestic effect of its own force. That understanding precludes the assertion that Congress has implicitly authorized the President—acting on his own—to achieve precisely the same result. We therefore conclude, given the absence of congressional legislation, that the non-self-executing treaties at issue here did not "express[ly] or implied[ly]" vest the President with the unilateral authority to make them self-executing. See *id.*, at 635 (Jackson, J., concurring). Accordingly, the President's Memorandum does not fall within the first category of the *Youngstown* framework.

Indeed, the preceding discussion should make clear that the non-self-executing character of the relevant treaties not only refutes the notion that the ratifying parties vested the President with the authority to unilaterally make treaty obligations binding on domestic courts, but also implicitly prohibits him from doing so. When the President asserts the power to "enforce" a non-self-executing treaty by unilaterally creating domestic law, he acts in conflict with the implicit understanding of the ratifying Senate. His assertion of authority, insofar as it is based on the pertinent non-self-executing treaties, is therefore within Justice Jackson's third category, not the first or even the second. See *id.*, at 637–638.

Each of the two means described above for giving domestic effect to an international treaty obligation under the Constitution—for making law—requires joint action by the Executive and Legislative Branches: The Senate can ratify a self-executing treaty "ma[de]" by the Executive, or, if the ratified treaty is not self-executing, Congress can enact implementing legislation approved by the President. It should not be surprising that our Constitution does not contemplate vesting such power in the Executive alone. As Madison ex-

plained in The Federalist No. 47, under our constitutional system of checks and balances, "[t]he magistrate in whom the whole executive power resides cannot of himself make a law." J. Cooke ed., p. 326 (1961). That would, however, seem an apt description of the asserted executive authority unilaterally to give the effect of domestic law to obligations under a non-self-executing treaty.

The United States nonetheless maintains that the President's Memorandum should be given effect as domestic law because "this case involves a valid Presidential action in the context of Congressional 'acquiescence.'" Brief for United States as *Amicus Curiae* 11, n. 2. Under the *Youngstown* tripartite framework, congressional acquiescence is pertinent when the President's action falls within the second category—that is, when he "acts in absence of either a congressional grant or denial of authority." 343 U. S., at 637 (Jackson, J., concurring). Here, however, as we have explained, the President's effort to accord domestic effect to the *Avena* judgment does not meet that prerequisite.

In any event, even if we were persuaded that congressional acquiescence could support the President's asserted authority to create domestic law pursuant to a non-self-executing treaty, such acquiescence does not exist here. The United States first locates congressional acquiescence in Congress's failure to act following the President's resolution of prior ICJ controversies. A review of the Executive's actions in those prior cases, however, cannot support the claim that Congress acquiesced in this particular exercise of Presidential authority, for none of them remotely involved transforming an international obligation into domestic law and thereby displacing state law.[14]

---

[14] Rather, in the *Case Concerning Military and Paramilitary Activities in and Against Nicaragua* (*Nicar.* v. *U. S.*), 1986 I. C. J. 14 (Judgment of June 27), the President determined that the United States would *not* comply with the ICJ's conclusion that the United States owed reparations to Nicaragua. In the *Case Concerning Delimitation of the Maritime*

The United States also directs us to the President's "related" statutory responsibilities and to his "established role" in litigating foreign policy concerns as support for the President's asserted authority to give the ICJ's decision in *Avena* the force of domestic law. Brief for United States as *Amicus Curiae* 16–19. Congress has indeed authorized the President to represent the United States before the United Nations, the ICJ, and the Security Council, 22 U. S. C. § 287, but the authority of the President to represent the United

Boundary in the Gulf of Maine Area *(Can. v. U. S.)*, 1984 I. C. J. 246 (Judgment of Oct. 12), a federal agency—the National Oceanic and Atmospheric Administration—issued a final rule which complied with the ICJ's boundary determination. The *Case Concerning Rights of Nationals of the United States of America in Morocco (Fr. v. U. S.)*, 1952 I. C. J. 176 (Judgment of Aug. 27), concerned the legal status of United States citizens living in Morocco; it was not enforced in United States courts.

The final two cases arose under the Vienna Convention. In the *LaGrand Case (F. R. G. v. U. S.)*, 2001 I. C. J. 466 (Judgment of June 27), the ICJ ordered the review and reconsideration of convictions and sentences of German nationals denied consular notification. In response, the State Department sent letters to the States "encouraging" them to consider the Vienna Convention in the clemency process. Brief for United States as *Amicus Curiae* 20–21. Such encouragement did not give the ICJ judgment direct effect as domestic law; thus, it cannot serve as precedent for doing so in which Congress might be said to have acquiesced. In the *Case Concerning the Vienna Convention on Consular Relations (Para. v. U. S.)*, 1998 I. C. J. 248 (Judgment of Apr. 9), the ICJ issued a provisional order, directing the United States to *"take all measures at its disposal* to ensure that [Breard] is not executed pending the final decision in [the ICJ's] proceedings." *Breard*, 523 U. S., at 374 (internal quotation marks omitted; emphasis added). In response, the Secretary of State sent a letter to the Governor of Virginia requesting that he stay Breard's execution. *Id.*, at 378. When Paraguay sought a stay of execution from this Court, the United States argued that it had taken every measure at its disposal: because "our federal system imposes limits on the federal government's ability to interfere with the criminal justice systems of the States," those measures included "only persuasion," not "legal compulsion." Brief for United States as *Amicus Curiae*, O. T. 1997, No. 97–8214 (A–732), p. 51. This of course is precedent contrary to the proposition asserted by the Solicitor General in this case.

States before such bodies speaks to the President's *international* responsibilities, not any unilateral authority to create domestic law. The authority expressly conferred by Congress in the international realm cannot be said to "invite" the Presidential action at issue here. See *Youngstown, supra,* at 637 (Jackson, J., concurring). At bottom, none of the sources of authority identified by the United States supports the President's claim that Congress has acquiesced in his asserted power to establish on his own federal law or to override state law.

None of this is to say, however, that the combination of a non-self-executing treaty and the lack of implementing legislation precludes the President from acting to comply with an international treaty obligation. It is only to say that the Executive cannot unilaterally execute a non-self-executing treaty by giving it domestic effect. That is, the non-self-executing character of a treaty constrains the President's ability to comply with treaty commitments by unilaterally making the treaty binding on domestic courts. The President may comply with the treaty's obligations by some other means, so long as they are consistent with the Constitution. But he may not rely upon a non-self-executing treaty to "establish binding rules of decision that preempt contrary state law." Brief for United States as *Amicus Curiae* 5.

## 2

We thus turn to the United States' claim that—independent of the United States' treaty obligations—the Memorandum is a valid exercise of the President's foreign affairs authority to resolve claims disputes with foreign nations. *Id.,* at 12–16. The United States relies on a series of cases in which this Court has upheld the authority of the President to settle foreign claims pursuant to an executive agreement. See *Garamendi,* 539 U. S., at 415; *Dames & Moore,* 453 U. S., at 679–680; *United States* v. *Pink,* 315 U. S. 203, 229 (1942);

*United States* v. *Belmont,* 301 U. S. 324, 330 (1937). In these cases this Court has explained that, if pervasive enough, a history of congressional acquiescence can be treated as a "gloss on 'Executive Power' vested in the President by § 1 of Art. II." *Dames & Moore, supra,* at 686 (some internal quotation marks omitted).

This argument is of a different nature than the one rejected above. Rather than relying on the United States' treaty obligations, the President relies on an independent source of authority in ordering Texas to put aside its procedural bar to successive habeas petitions. Nevertheless, we find that our claims-settlement cases do not support the authority that the President asserts in this case. .

The claims-settlement cases involve a narrow set of circumstances: the making of executive agreements to settle civil claims between American citizens and foreign governments or foreign nationals. See, *e. g., Belmont, supra,* at 327. They are based on the view that "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned," can "raise a presumption that the [action] had been [taken] in pursuance of its consent." *Dames & Moore, supra,* at 686 (internal quotation marks omitted). As this Court explained in *Garamendi*:

> "Making executive agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice . . . . Given the fact that the practice goes back over 200 years, and has received congressional acquiescence throughout its history, the conclusion that the President's control of foreign relations includes the settlement of claims is indisputable." 539 U. S., at 415 (internal quotation marks and brackets omitted).

Even still, the limitations on this source of executive power are clearly set forth and the Court has been careful to note

that "[p]ast practice does not, by itself, create power." *Dames & Moore, supra,* at 686.

The President's Memorandum is not supported by a "particularly longstanding practice" of congressional acquiescence, see *Garamendi, supra,* at 415, but rather is what the United States itself has described as "unprecedented action," Brief for United States as *Amicus Curiae* in *Sanchez-Llamas,* O. T. 2005, Nos. 05–51 and 04–10566, pp. 29–30. Indeed, the Government has not identified a single instance in which the President has attempted (or Congress has acquiesced in) a Presidential directive issued to state courts, much less one that reaches deep into the heart of the State's police powers and compels state courts to reopen final criminal judgments and set aside neutrally applicable state laws. Cf. *Brecht* v. *Abrahamson,* 507 U. S. 619, 635 (1993) ("States possess primary authority for defining and enforcing the criminal law" (quoting *Engle* v. *Isaac,* 456 U. S. 107, 128 (1982); internal quotation marks omitted)). The Executive's narrow and strictly limited authority to settle international claims disputes pursuant to an executive agreement cannot stretch so far as to support the current Presidential Memorandum.

3

Medellín argues that the President's Memorandum is a valid exercise of his "[T]ake Care" power. Brief for Petitioner 28. The United States, however, does not rely upon the President's responsibility to "take Care that the Laws be faithfully executed." U. S. Const., Art. II, § 3. We think this a wise concession. This authority allows the President to execute the laws, not make them. For the reasons we have stated, the *Avena* judgment is not domestic law; accordingly, the President cannot rely on his Take Care powers here.

The judgment of the Texas Court of Criminal Appeals is affirmed.

*It is so ordered.*

JUSTICE STEVENS, concurring in the judgment.

There is a great deal of wisdom in JUSTICE BREYER's dissent. I agree that the text and history of the Supremacy Clause, as well as this Court's treaty-related cases, do not support a presumption against self-execution. See *post*, at 541–546. I also endorse the proposition that the Vienna Convention on Consular Relations, Apr. 24, 1963, [1970] 21 U. S. T. 77, T. I. A. S. No. 6820, "is itself self-executing and judicially enforceable." *Post*, at 555. Moreover, I think this case presents a closer question than the Court's opinion allows. In the end, however, I am persuaded that the relevant treaties do not authorize this Court to enforce the judgment of the International Court of Justice (ICJ) in *Case Concerning Avena and Other Mexican Nationals (Mex.* v. *U. S.)*, 2004 I. C. J. 12 (Judgment of Mar. 31) *(Avena)*.

The source of the United States' obligation to comply with judgments of the ICJ is found in Article 94(1) of the United Nations Charter, which was ratified in 1945. Article 94(1) provides that "[e]ach Member of the United Nations *undertakes to comply* with the decision of the [ICJ] in any case to which it is a party." 59 Stat. 1051, T. S. No. 993 (emphasis added). In my view, the words "undertakes to comply"—while not the model of either a self-executing or a non-self-executing commitment—are most naturally read as a promise to take additional steps to enforce ICJ judgments.

Unlike the text of some other treaties, the terms of the United Nations Charter do not necessarily incorporate international judgments into domestic law. Cf., *e. g.*, United Nations Convention on the Law of the Sea, Annex VI, Art. 39, Dec. 10, 1982, S. Treaty Doc. No. 103–39, 1833 U. N. T. S. 570 ("[D]ecisions of the [Seabed Disputes] Chamber shall be enforceable in the territories of the States Parties in the same manner as judgments or orders of the highest court of the State Party in whose territory the enforcement is sought"). Moreover, Congress has passed implementing legislation to ensure the enforcement of other international judgments,

even when the operative treaty provisions use far more mandatory language than "undertakes to comply."[1]

On the other hand Article 94(1) does not contain the kind of unambiguous language foreclosing self-execution that is found in other treaties. The obligation to undertake to comply with ICJ decisions is more consistent with self-execution than, for example, an obligation to enact legislation. Cf., e. g., International Plant Protection Convention, Art. I, Dec. 6, 1951, [1972] 23 U. S. T. 2770, T. I. A. S. No. 7465 ("[T]he contracting Governments undertake to adopt the legislative, technical and administrative measures specified in this Convention"). Furthermore, whereas the Senate has issued declarations of non-self-execution when ratifying some treaties, it did not do so with respect to the United Nations Charter.[2]

Absent a presumption one way or the other, the best reading of the words "undertakes to comply" is, in my judgment, one that contemplates future action by the political branches. I agree with the dissenters that "Congress is unlikely to authorize automatic judicial enforceability of all ICJ judgments, for that could include some politically sensitive judg-

---

[1] See, e. g., Convention on the Settlement of Investment Disputes between States and Nationals of Other States (ICSID Convention), ch. IV, §6, Art. 54(1), Mar. 18, 1965, [1966] 17 U. S. T. 1291, T. I. A. S. No. 6090 ("Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State"); 22 U. S. C. §1650a ("An award of an arbitral tribunal rendered pursuant to chapter IV of the [ICSID Convention] shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States").

[2] Cf., e. g., U. S. Reservations, Declarations and Understandings, International Covenant on Civil and Political Rights, 138 Cong. Rec. 8071 (1992) ("[T]he United States declares that the provisions of Articles 1 through 27 of the Covenant are not self-executing").

ments and others better suited for enforcement by other branches." *Post*, at 560. But this concern counsels in favor of reading any ambiguity in Article 94(1) as leaving the choice of whether to comply with ICJ judgments, and in what manner, "to the political, not the judicial department." *Foster* v. *Neilson*, 2 Pet. 253, 314 (1829).[3]

The additional treaty provisions cited by the dissent do not suggest otherwise. In an annex to the United Nations Charter, the Statute of the International Court of Justice (ICJ Statute) states that a decision of the ICJ "has no binding force except between the parties and in respect of that particular case." Art. 59, 59 Stat. 1062. Because I read that provision as confining, not expanding, the effect of ICJ judgments, it does not make the undertaking to comply with such judgments any more enforceable than the terms of Article 94(1) itself. That the judgment is "binding" as a matter of international law says nothing about its domestic legal effect. Nor in my opinion does the reference to "compulsory jurisdiction" in the Optional Protocol Concerning the Compulsory Settlement of Disputes to the Vienna Convention, Art. I, Apr. 24, 1963, [1970] 21 U. S. T. 325, T. I. A. S. No. 6820, shed any light on the matter. This provision merely secures the consent of signatory nations to the specific jurisdiction of the ICJ with respect to claims arising out of the Vienna Convention. See ICJ Statute, Art. 36(1), 59 Stat. 1060 ("The jurisdiction of the Court comprises . . . all matters specially provided for . . . in treaties and conventions in force").

---

[3] Congress' implementation options are broader than the dissent suggests. In addition to legislating judgment by judgment, enforcing all judgments indiscriminately, and devising "legislative bright lines," *post*, at 560, Congress could, for example, make ICJ judgments enforceable upon the expiration of a waiting period that gives the political branches an opportunity to intervene. Cf., *e. g.*, 16 U. S. C. § 1823 (imposing a 120-day waiting period before international fishery agreements take effect).

Even though the ICJ's judgment in *Avena* is not "the supreme Law of the Land," U. S. Const., Art. VI, cl. 2, no one disputes that it constitutes an international law obligation on the part of the United States, *ante*, at 504. By issuing a memorandum declaring that state courts should give effect to the judgment in *Avena*, the President made a commendable attempt to induce the States to discharge the Nation's obligation. I agree with the Texas judges and the majority of this Court that the President's memorandum is not binding law. Nonetheless, the fact that the President cannot legislate unilaterally does not absolve the United States from its promise to take action necessary to comply with the ICJ's judgment.

Under the express terms of the Supremacy Clause, the United States' obligation to "undertak[e] to comply" with the ICJ's decision falls on each of the States as well as the Federal Government. One consequence of our form of government is that sometimes States must shoulder the primary responsibility for protecting the honor and integrity of the Nation. Texas' duty in this respect is all the greater since it was Texas that—by failing to provide consular notice in accordance with the Vienna Convention—ensnared the United States in the current controversy. Having already put the Nation in breach of one treaty, it is now up to Texas to prevent the breach of another.

The decision in *Avena* merely obligates the United States "to provide, by means of its own choosing, review and reconsideration of the convictions and sentences of the [affected] Mexican nationals," 2004 I. C. J., at 72, ¶ 153(9), "with a view to ascertaining" whether the failure to provide proper notice to consular officials "caused actual prejudice to the defendant in the process of administration of criminal justice," *id.*, at 60, ¶ 121. The cost to Texas of complying with *Avena* would be minimal, particularly given the remote likelihood that the violation of the Vienna Convention actually prejudiced José

Ernesto Medellín. See *ante,* at 500–502, and n. 1. It is a cost that the State of Oklahoma unhesitatingly assumed.[4]

On the other hand, the costs of refusing to respect the ICJ's judgment are significant. The entire Court and the President agree that breach will jeopardize the United States' "plainly compelling" interests in "ensuring the reciprocal observance of the Vienna Convention, protecting relations with foreign governments, and demonstrating commitment to the role of international law." *Ante,* at 524. When the honor of the Nation is balanced against the modest cost of compliance, Texas would do well to recognize that more is at stake than whether judgments of the ICJ, and the principled admonitions of the President of the United States, trump state procedural rules in the absence of implementing legislation.

The Court's judgment, which I join, does not foreclose further appropriate action by the State of Texas.

---

[4] In *Avena,* the ICJ expressed "great concern" that Oklahoma had set the date of execution for one of the Mexican nationals involved in the judgment, Osbaldo Torres, for May 18, 2004. 2004 I. C. J., at 28, ¶ 21. Responding to *Avena,* the Oklahoma Court of Criminal Appeals stayed Torres' execution and ordered an evidentiary hearing on whether Torres had been prejudiced by the lack of consular notification. See *Torres* v. *State,* No. PCD–04–442 (May 13, 2004), 43 I. L. M. 1227. On the same day, the Governor of Oklahoma commuted Torres' death sentence to life without the possibility of parole, stressing that (1) the United States signed the Vienna Convention, (2) that treaty is "important in protecting the rights of American citizens abroad," (3) the ICJ ruled that Torres' rights had been violated, and (4) the U. S. State Department urged his office to give careful consideration to the United States' treaty obligations. See Office of Governor Brad Henry, Press Release: Gov. Henry Grants Clemency to Death Row Inmate Torres (May 13, 2004), online at http://www.ok.gov/governor/display_article.php?article_id=301&article_type=1 (as visited Mar. 20, 2008, and available in Clerk of Court's case file). After the evidentiary hearing, the Oklahoma Court of Criminal Appeals held that Torres had failed to establish prejudice with respect to the guilt phase of his trial, and that any prejudice with respect to the sentencing phase had been mooted by the commutation order. *Torres* v. *State,* 120 P. 3d 1184 (2005).

JUSTICE BREYER, with whom JUSTICE SOUTER and JUS-
TICE GINSBURG join, dissenting.

The Constitution's Supremacy Clause provides that "all
Treaties . . . which shall be made . . . under the Authority of
the United States, shall be the supreme Law of the Land;
and the Judges in every State shall be bound thereby."
Art. VI, cl. 2. The Clause means that the "courts" must
regard "a treaty . . . as equivalent to an act of the legislature,
whenever it operates of itself without the aid of any legisla-
tive provision." *Foster* v. *Neilson,* 2 Pet. 253, 314 (1829)
(majority opinion of Marshall, C. J.).

In the *Avena* case the International Court of Justice (ICJ)
(interpreting and applying the Vienna Convention on Con-
sular Relations) issued a judgment that requires the United
States to reexamine certain criminal proceedings in the
cases of 51 Mexican nationals. *Case Concerning Avena and
Other Mexican Nationals (Mex.* v. *U. S.),* 2004 I. C. J. 12
(Judgment of Mar. 31) *(Avena).* The question here is
whether the ICJ's *Avena* judgment is enforceable now as a
matter of domestic law, *i. e.,* whether it "operates of itself
without the aid" of any further legislation.

The United States has signed and ratified a series of trea-
ties obliging it to comply with ICJ judgments in cases in
which it has given its consent to the exercise of the ICJ's
adjudicatory authority. Specifically, the United States has
agreed to submit, in this kind of case, to the ICJ's "compul-
sory jurisdiction" for purposes of "compulsory settlement."
Optional Protocol Concerning the Compulsory Settlement of
Disputes (Optional Protocol or Protocol), Art. I, Apr. 24,
1963, [1970] 21 U. S. T. 326, T. I. A. S. No. 6820 (capitalization
altered). And it agreed that the ICJ's judgments would
have "binding force . . . between the parties and in respect
of [a] particular case." United Nations Charter, Art. 59, 59
Stat. 1062, T. S. No. 993 (1945). President Bush has deter-
mined that domestic courts should enforce this particular
ICJ judgment. Memorandum for the Attorney General

(Feb. 28, 2005), App. to Pet. for Cert. 187a (hereinafter President's Memorandum). And Congress has done nothing to suggest the contrary. Under these circumstances, I believe the treaty obligations, and hence the judgment, resting as it does upon the consent of the United States to the ICJ's jurisdiction, bind the courts no less than would "an act of the [federal] legislature." *Foster, supra*, at 314.

## I

To understand the issue before us, the reader must keep in mind three separate ratified United States treaties and one ICJ judgment against the United States. The first treaty, the Vienna Convention, contains two relevant provisions. The first requires the United States and other signatory nations to inform arrested foreign nationals of their separate Convention-given right to contact their nation's consul. The second says that these rights (of an arrested person) "shall be exercised in conformity with the laws and regulations" of the arresting nation, *provided that the "laws and regulations . . . enable full effect to be given to the purposes for which" those "rights . . . are intended."* See Vienna Convention on Consular Relations, Arts. 36(1)(b), 36(2), Apr. 24, 1963, [1970] 21 U. S. T. 100–101 (emphasis added).

The second treaty, the Optional Protocol, concerns the "compulsory settlement" of Vienna Convention disputes. 21 U. S. T., at 326. It provides that for parties that elect to subscribe to the Protocol, "[d]isputes arising out of the interpretation or application of the [Vienna] Convention" shall be submitted to the "compulsory jurisdiction of the International Court of Justice." Art. I, *ibid.* It authorizes any party that has consented to the ICJ's jurisdiction (by signing the Optional Protocol) to bring another such party before that Court. *Ibid.*

The third treaty, the United Nations Charter, says that every signatory nation "undertakes to comply with the decision of the International Court of Justice in any case to

which it is a party." Art. 94(1), 59 Stat. 1051. In an annex to the Charter, the Statute of the International Court of Justice (ICJ Statute) states that an ICJ judgment has "binding force . . . between the parties and in respect of that particular case." Art. 59, *id.*, at 1062. See also Art. 60, *id.*, at 1063 (ICJ "judgment is final and without appeal").

The judgment at issue is the ICJ's judgment in *Avena,* a case that Mexico brought against the United States on behalf of 52 nationals arrested in different States on different criminal charges. 2004 I. C. J., at 39. Mexico claimed that state authorities within the United States had failed to notify the arrested persons of their Vienna Convention rights and, by applying state procedural law in a manner which did not give full effect to the Vienna Convention rights, had deprived them of an appropriate remedy. *Ibid.* The ICJ judgment in *Avena* requires that the United States reexamine "by means of its own choosing" certain aspects of the relevant state criminal proceedings of 51 of these individual Mexican nationals. *Id.,* at 62, ¶ 129 (internal quotation marks omitted). The President has determined that this should be done. See President's Memorandum.

The critical question here is whether the Supremacy Clause requires Texas to follow, *i. e.,* to enforce, this ICJ judgment. The Court says "no." And it reaches its negative answer by interpreting the labyrinth of treaty provisions as creating a legal obligation that binds the United States internationally, but which, for Supremacy Clause purposes, is not automatically enforceable as domestic law. In the majority's view, the Optional Protocol simply sends the dispute to the ICJ; the ICJ Statute says that the ICJ will subsequently reach a judgment; and the U. N. Charter contains no more than a promise to "'undertak[e] to comply'" with that judgment. *Ante,* at 500. Such a promise, the majority says, does not as a domestic-law matter (in Chief Justice Marshall's words) "operat[e] of itself without the aid of any legislative provision." *Foster, supra,* at 314. Rather,

here (and presumably in any other ICJ judgment rendered pursuant to any of the approximately 70 U. S. treaties in force that contain similar provisions for submitting treaty-based disputes to the ICJ for decisions that bind the parties) Congress must enact specific legislation before ICJ judgments entered pursuant to our consent to compulsory ICJ jurisdiction can become domestic law. See Brief for International Court of Justice Experts as *Amici Curiae* 18 ("Approximately 70 U. S. treaties now in force contain obligations comparable to those in the Optional Protocol for submission of treaty-based disputes to the ICJ"); see also *id.*, at 18, n. 25.

In my view, the President has correctly determined that Congress need not enact additional legislation. The majority places too much weight upon treaty language that says little about the matter. The words "'undertak[e] to comply,'" for example, do not tell us whether an ICJ judgment rendered pursuant to the parties' consent to compulsory ICJ jurisdiction does, or does not, automatically become part of our domestic law. To answer that question we must look instead to our own domestic law, in particular, to the many treaty-related cases interpreting the Supremacy Clause. Those cases, including some written by Justices well aware of the Founders' original intent, lead to the conclusion that the ICJ judgment before us is enforceable as a matter of domestic law without further legislation.

## A

Supreme Court case law stretching back more than 200 years helps explain what, for present purposes, the Founders meant when they wrote that "all Treaties . . . shall be the supreme Law of the Land." Art. VI, cl. 2. In 1796, for example, the Court decided the case of *Ware* v. *Hylton*, 3 Dall. 199. A British creditor sought payment of an American's Revolutionary War debt. The debtor argued that he had, under Virginia law, repaid the debt by complying with a state statute enacted during the Revolutionary War that

required debtors to repay money owed to British creditors into a Virginia state fund. *Id.*, at 220–221 (opinion of Chase, J.). The creditor, however, claimed that this state-sanctioned repayment did not count because a provision of the 1783 Paris Peace Treaty between Britain and the United States said that "'the creditors of either side should meet with no lawful impediment to the recovery of the full value . . . of all *bona fide* debts, theretofore contracted'"; and that provision, the creditor argued, effectively nullified the state law. *Id.*, at 203–204 (Reporter's Summary). The Court, with each Justice writing separately, agreed with the British creditor, held the Virginia statute invalid, and found that the American debtor remained liable for the debt. *Id.*, at 285.

The key fact relevant here is that Congress had not enacted a specific statute enforcing the treaty provision at issue. Hence the Court had to decide whether the provision was (to put the matter in present terms) "self-executing." Justice Iredell, a member of North Carolina's Ratifying Convention, addressed the matter specifically, setting forth views on which Justice Story later relied to explain the Founders' reasons for drafting the Supremacy Clause. 3 J. Story, Commentaries on the Constitution of the United States 696–697 (1833) (hereinafter Story). See Vázquez, The Four Doctrines of Self-Executing Treaties, 89 Am. J. Int'l L. 695, 697–700 (1995) (hereinafter Vázquez) (describing the history and purpose of the Supremacy Clause). See also Flaherty, History Right?: Historical Scholarship, Original Understanding, and Treaties as "Supreme Law of the Land," 99 Colum. L. Rev. 2095 (1999) (contending that the Founders crafted the Supremacy Clause to make ratified treaties self-executing). But see Yoo, Globalism and the Constitution: Treaties, Non-Self-Execution, and the Original Understanding, 99 Colum. L. Rev. 1955 (1999).

Justice Iredell pointed out that some treaty provisions, those, for example, declaring the United States an independ-

ent Nation or acknowledging its right to navigate the Mississippi River, were *"executed,"* taking effect automatically upon ratification. 3 Dall., at 272. Other provisions were *"executory,"* in the sense that they were "to be carried into execution" by each signatory nation "in the manner which the Constitution of that nation prescribes." *Ibid.* *Before* adoption of the U. S. Constitution, all such provisions would have taken effect as domestic law *only if* Congress on the American side, or Parliament on the British side, had written them into domestic law. *Id.,* at 274–277.

But, Justice Iredell adds, *after* the Constitution's adoption, while further parliamentary action remained necessary in Britain (where the "practice" of the need for an "act of parliament" in respect to "any thing of a legislative nature" had "been constantly observed," *id.,* at 275–276), further legislative action in respect to the treaty's debt-collection provision *was no longer necessary* in the United States. *Id.,* at 276–277. The ratification of the Constitution with its Supremacy Clause means that treaty provisions that bind the United States may (and in this instance did) also enter domestic law without further congressional action and automatically bind the States and courts as well. *Id.,* at 277.

"Under this Constitution," Justice Iredell concluded, "so far as a treaty constitutionally is binding, upon principles of *moral obligation,* it is also by the vigour of its own authority to be executed in fact. It would not otherwise be the *Supreme law* in the new sense provided for." *Ibid.;* see also Story, § 1833, at 697 (noting that the Supremacy Clause's language was crafted to make the Clause's "obligation more strongly felt by the state judges" and to "remov[e] every pretense" by which they could "escape from [its] controlling power"); see also The Federalist No. 42, p. 264 (C. Rossiter ed. 1961) (J. Madison) (Supremacy Clause "disembarrassed" the Convention of the problem presented by the Articles of Confederation where "treaties might be substantially frustrated by regulations of the States"). Justice Ire-

dell gave examples of provisions that would no longer require further legislative action, such as those requiring the release of prisoners, those forbidding war-related "'future confiscations'" and "'prosecutions,'" and, of course, the specific debt-collection provision at issue in the *Ware* case itself. 3 Dall., at 273, 277.

Some 30 years later, the Court returned to the "self-execution" problem. In *Foster*, 2 Pet. 253, the Court examined a provision in an 1819 treaty with Spain ceding Florida to the United States; the provision said that "'grants of land made'" by Spain before January 24, 1818, "'shall be ratified and confirmed'" to the grantee. *Id.*, at 310. Chief Justice Marshall, writing for the Court, noted that, as a general matter, one might expect a signatory nation to execute a treaty through a formal exercise of its domestic sovereign authority (*e. g.*, through an act of the legislature). *Id.*, at 314. But in the United States *"a different principle"* applies. *Ibid.* (emphasis added). The Supremacy Clause means that, here, a treaty is "the law of the land . . . to be regarded in Courts of justice as equivalent to an act of the legislature" and "operates of itself without the aid of any legislative provision" unless it specifically contemplates execution by the legislature and thereby *"addresses itself to the political, not the judicial department." Ibid.* (emphasis added). The Court decided that the treaty provision in question was *not* self-executing; in its view, the words "shall be ratified" demonstrated that the provision foresaw further legislative action. *Id.*, at 315.

The Court, however, changed its mind about the result in *Foster* four years later, after being shown a less legislatively oriented, less tentative, but equally authentic Spanish-language version of the treaty. See *United States* v. *Percheman*, 7 Pet. 51, 88–89 (1833). And by 1840, instances in which treaty provisions automatically became part of domestic law were common enough for one Justice to write that "it would be a bold proposition" to assert "that an act of Con-

gress must be first passed" in order to give a treaty effect as "a supreme law of the land." *Lessee of Pollard's Heirs* v. *Kibbe*, 14 Pet. 353, 388 (1840) (Baldwin, J., concurring).

Since *Foster* and *Pollard*, this Court has frequently held or assumed that particular treaty provisions are self-executing, automatically binding the States without more. See Appendix A, *infra* (listing, as examples, 29 such cases, including 12 concluding that the treaty provision invalidates state or territorial law or policy as a consequence). See also Wu, Treaties' Domains, 93 Va. L. Rev. 571, 583–584 (2007) (concluding "enforcement against States is the primary and historically most significant type of treaty enforcement in the United States"). As far as I can tell, the Court has held to the contrary only in two cases: *Foster, supra*, which was later reversed, and *Cameron Septic Tank Co.* v. *Knoxville*, 227 U. S. 39 (1913), where specific congressional actions indicated that Congress thought further legislation necessary. See also Vázquez 716. The Court has found "self-executing" provisions in multilateral treaties as well as bilateral treaties. See, *e. g., Trans World Airlines, Inc.* v. *Franklin Mint Corp.*, 466 U. S. 243, 252 (1984); *Bacardi Corp. of America* v. *Domenech*, 311 U. S. 150, 160, and n. 9, 161 (1940). And the subject matter of such provisions has varied widely, from extradition, see, *e. g., United States* v. *Rauscher*, 119 U. S. 407, 411–412 (1886), to criminal trial jurisdiction, see *Wildenhus's Case*, 120 U. S. 1, 11, 17–18 (1887), to civil liability, see, *e. g., El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng*, 525 U. S. 155, 161–163 (1999), to trademark infringement, see *Bacardi, supra*, at 160, and n. 9, 161, to an alien's freedom to engage in trade, see, *e. g., Jordan* v. *Tashiro*, 278 U. S. 123, 126, n. 1 (1928), to immunity from state taxation, see *Nielsen* v. *Johnson*, 279 U. S. 47, 50, 58 (1929), to land ownership, *Percheman, supra*, at 88–89, and to inheritance, see, *e. g., Kolovrat* v. *Oregon*, 366 U. S. 187, 191, n. 6, 198 (1961).

Of particular relevance to the present case, the Court has held that the United States may be obligated by treaty to

comply with the judgment of an international tribunal interpreting that treaty, despite the absence of any congressional enactment specifically requiring such compliance. See *Comegys* v. *Vasse*, 1 Pet. 193, 211–212 (1828) (holding that decision of tribunal rendered pursuant to a United States-Spain treaty, which obliged the parties to "undertake to make satisfaction" of treaty-based rights, was "conclusive and final" and "not re-examinable" in American courts); see also *Meade* v. *United States*, 9 Wall. 691, 725 (1870) (holding that decision of tribunal adjudicating claims arising under United States-Spain treaty "was final and conclusive, and bar[red] a recovery upon the merits" in American court).

All of these cases make clear that self-executing treaty provisions are not uncommon or peculiar creatures of our domestic law; that they cover a wide range of subjects; that the Supremacy Clause itself answers the self-execution question by applying many, but not all, treaty provisions directly to the States; and that the Clause answers the self-execution question differently than does the law in many other nations. See *supra*, at 541–545 and this page. The cases also provide criteria that help determine *which* provisions automatically so apply—a matter to which I now turn.

### B

### 1

The case law provides no simple magic answer to the question whether a particular treaty provision is self-executing. But the case law does make clear that, insofar as today's majority looks for language about "self-execution" in the treaty itself and insofar as it erects "clear statement" presumptions designed to help find an answer, it is misguided. See, *e. g., ante*, at 517 (expecting "clea[r] state-[ment]" of parties' intent where treaty obligation "may interfere with state procedural rules"); *ante*, at 526 (for treaty to be self-executing, Executive should at drafting "ensur[e] that it contains language plainly providing for domestic enforceability").

The many treaty provisions that this Court has found self-executing contain no textual language on the point (see Appendix A, *infra*). Few, if any, of these provisions are clear. See, *e. g., Ware*, 3 Dall., at 273 (opinion of Iredell, J.). Those that displace state law in respect to such quintessential state matters as, say, property, inheritance, or debt repayment, lack the "clea[r] state[ment]" that the Court today apparently requires. Compare *ante*, at 517 (majority expects "clea[r] state[ment]" of parties' intent where treaty obligation "may interfere with state procedural rules"). This is also true of those cases that deal with state rules roughly comparable to the sort that the majority suggests require special accommodation. See, *e. g., Hopkirk* v. *Bell*, 3 Cranch 454, 457–458 (1806) (treaty pre-empts Virginia state statute of limitations). Cf. *ante*, at 517 (setting forth majority's reliance on case law that is apparently inapposite). These many Supreme Court cases finding treaty provisions to be self-executing cannot be reconciled with the majority's demand for textual clarity.

Indeed, the majority does not point to a single ratified United States treaty that contains the kind of "clea[r]" or "plai[n]" textual indication for which the majority searches. *Ante*, at 517, 526. JUSTICE STEVENS' reliance upon one ratified and one *un*-ratified treaty to make the point that a treaty *could* speak clearly on the matter of self-execution, see *ante*, at 533–534, and n. 1 (opinion concurring in judgment), does suggest that there are a few such treaties. But that simply highlights how few of them actually *do* speak clearly on the matter. And that is not because the United States never, or hardly ever, has entered into a treaty with self-executing provisions. The case law belies any such conclusion. Rather, it is because the issue whether further legislative action is required before a treaty provision takes domestic effect in a signatory nation is often a matter of how that nation's domestic law regards the provision's legal status. And that domestic status-determining law differs markedly from one nation to another. See generally Hollis,

Comparative Approach to Treaty Law and Practice, in National Treaty Law and Practice 1, 9–50 (D. Hollis, M. Blakeslee, & L. Ederington eds. 2005) (hereinafter Hollis). As Justice Iredell pointed out 200 years ago, Britain, for example, taking the view that the British Crown makes treaties but Parliament makes domestic law, virtually always requires parliamentary legislation. See *Ware, supra,* at 274–277; Sinclair, Dickson, & Maciver, United Kingdom, in National Treaty Law and Practice, *supra,* at 727, 733, and n. 9 (in Britain, "'treaties are not self-executing'" (citing *Queen* v. *Secretary of State for Foreign and Commonwealth Affairs, ex parte Lord Rees-Mogg,* [1994] Q. B. 552 (1993))). See also Torruella, The *Insular Cases:* The Establishment of a Regime of Political Apartheid, 29 U. Pa. J. Int'l L. 283, 337 (2007). On the other hand, the United States, with its Supremacy Clause, does not take Britain's view. See, *e. g., Ware, supra,* at 277 (opinion of Iredell, J.). And the law of other nations, the Netherlands for example, directly incorporates many treaties concluded by the executive into its domestic law even without explicit parliamentary approval of the treaty. See Brouwer, The Netherlands, in National Treaty Law and Practice, *supra,* at 483, 483–502.

The majority correctly notes that the treaties do not explicitly state that the relevant obligations are self-executing. But given the differences among nations, why would drafters write treaty language stating that a provision about, say, alien property inheritance, is self-executing? How could those drafters achieve agreement when one signatory nation follows one tradition and a second follows another? Why would such a difference matter sufficiently for drafters to try to secure language that would prevent, for example, Britain's following treaty ratification with a further law while (perhaps unnecessarily) insisting that the United States apply a treaty provision without further domestic legislation? Above all, what does the absence of specific language about

"self-execution" prove? It may reflect the drafters' awareness of national differences. It may reflect the practical fact that drafters, favoring speedy, effective implementation, conclude they should best leave national legal practices alone. It may reflect the fact that achieving international agreement on *this* point is simply a game not worth the candle.

In a word, for present purposes, the absence or presence of language in a treaty about a provision's self-execution proves nothing at all. At best the Court is hunting the snark. At worst it erects legalistic hurdles that can threaten the application of provisions in many existing commercial and other treaties and make it more difficult to negotiate new ones. (For examples, see Appendix B, *infra.*)

2

The case law also suggests practical, context-specific criteria that this Court has previously used to help determine whether, for Supremacy Clause purposes, a treaty provision is self-executing. The provision's text matters very much. Cf. *ante,* at 514–516. But that is not because it contains language that explicitly refers to self-execution. For reasons I have already explained, Part I–B–1, *supra,* one should not expect *that* kind of textual statement. Drafting history is also relevant. But, again, that is not because it will explicitly address the relevant question. Instead text and history, along with subject matter and related characteristics, will help our courts determine whether, as Chief Justice Marshall put it, the treaty provision "addresses itself to the political . . . department[s]" for further action or to "the judicial department" for direct enforcement. *Foster,* 2 Pet., at 314; see also *Ware,* 3 Dall., at 244 (opinion of Chase, J.) ("No one can doubt that a treaty may stipulate, that certain acts shall be done by the Legislature; that other acts shall be done by the Executive; and others by the Judiciary").

In making this determination, this Court has found the provision's subject matter of particular importance. Does

the treaty provision declare peace? Does it promise not to engage in hostilities? If so, it addresses itself to the political branches. See *id.*, at 259–262 (opinion of Iredell, J.). Alternatively, does it concern the adjudication of traditional private legal rights such as rights to own property, to conduct a business, or to obtain civil tort recovery? If so, it may well address itself to the judiciary. Enforcing such rights and setting their boundaries is the bread-and-butter work of the courts. See, *e. g., Clark* v. *Allen,* 331 U. S. 503 (1947) (treating provision with such subject matter as self-executing); *Asakura* v. *Seattle,* 265 U. S. 332 (1924) (same).

One might also ask whether the treaty provision confers specific, detailed individual legal rights. Does it set forth definite standards that judges can readily enforce? Other things being equal, where rights are specific and readily enforceable, the treaty provision more likely "addresses" the judiciary. See, *e. g., Olympic Airways* v. *Husain,* 540 U. S. 644 (2004) (specific conditions for air-carrier civil liability); *Geofroy* v. *Riggs,* 133 U. S. 258 (1890) (French citizens' inheritance rights). Cf. *Foster, supra,* at 314–315 (treaty provision stating that landholders' titles "shall be ratified and confirmed" foresees legislative action).

Alternatively, would direct enforcement require the courts to create a new cause of action? Would such enforcement engender constitutional controversy? Would it create constitutionally undesirable conflict with the other branches? In such circumstances, it is not likely that the provision contemplates direct judicial enforcement. See, *e. g., Asakura, supra,* at 341 (although "not limited by any express provision of the Constitution," the treaty-making power of the United States "does not extend 'so far as to authorize what the Constitution forbids'").

Such questions, drawn from case law stretching back 200 years, do not create a simple test, let alone a magic formula. But they do help to constitute a practical, context-specific judicial approach, seeking to separate run-of-the-mill judicial

matters from other matters, sometimes more politically charged, sometimes more clearly the responsibility of other branches, sometimes lacking those attributes that would permit courts to act on their own without more ado. And such an approach is all that we need to find an answer to the legal question now before us.

C

Applying the approach just described, I would find the relevant treaty provisions self-executing as applied to the ICJ judgment before us (giving that judgment domestic legal effect) for the following reasons, taken together.

*First,* the language of the relevant treaties strongly supports direct judicial enforceability, at least of judgments of the kind at issue here. The Optional Protocol bears the title "Compulsory Settlement of Disputes," thereby emphasizing the mandatory and binding nature of the procedures it sets forth. 21 U. S. T., at 326. The body of the Protocol says specifically that "any party" that has consented to the ICJ's "compulsory jurisdiction" may bring a "dispute" before the court against any other such party. Art. I, *ibid.* And the Protocol contrasts proceedings of the compulsory kind with an alternative "conciliation procedure," the recommendations of which a party may decide "not" to "accep[t]." Art. III, *id.,* at 327. Thus, the Optional Protocol's basic objective is not just to provide a forum for *settlement* but to provide a forum for *compulsory* settlement.

Moreover, in accepting Article 94(1) of the Charter, "[e]ach Member . . . undertakes to comply with the decision" of the ICJ "in any case to which it is a party." 59 Stat. 1051. And the ICJ Statute (part of the U. N. Charter) makes clear that a decision of the ICJ between parties that have consented to the ICJ's compulsory jurisdiction has *"binding force* . . . between the parties and in respect of that particular case." Art. 59, *id.,* at 1062 (emphasis added). Enforcement of a court's judgment that has "binding force" involves quintessential judicial activity.

True, neither the Protocol nor the Charter explicitly states that the obligation to comply with an ICJ judgment automatically binds a party *as a matter of domestic law* without further domestic legislation. *But how could the language of those documents do otherwise?* The treaties are multilateral. And, as I have explained, some signatories follow British further-legislation-always-needed principles, others follow United States Supremacy Clause principles, and still others, *e. g.*, the Netherlands, can directly incorporate treaty provisions into their domestic law in particular circumstances. See Hollis 9–50. Why, given national differences, would drafters, seeking as strong a legal obligation as is practically attainable, use treaty language that *requires* all signatories to adopt uniform domestic-law treatment in this respect?

The absence of that likely unobtainable language can make no difference. We are considering the language for purposes of applying the Supremacy Clause. And for that purpose, this Court has found to be self-executing multilateral treaty language that is far less direct or forceful (on the relevant point) than the language set forth in the present treaties. See, *e. g.*, *Trans World Airlines*, 466 U. S., at 247, 252; *Bacardi*, 311 U. S., at 160, and n. 9, 161. The language here in effect tells signatory nations to make an ICJ compulsory jurisdiction judgment "as binding as you can." Thus, assuming other factors favor self-execution, the language *adds*, rather than *subtracts*, support.

Indeed, as I have said, *supra*, at 540–541, the United States has ratified approximately 70 treaties with ICJ dispute resolution provisions roughly similar to those contained in the Optional Protocol; many of those treaties contemplate ICJ adjudication of the sort of substantive matters (property, commercial dealings, and the like) that the Court has found self-executing, or otherwise appear addressed to the judicial branch. See Appendix B, *infra*. None of the ICJ provisions in these treaties contains stronger language about

self-execution than the language at issue here. See, *e. g.,* Treaty of Friendship, Commerce and Navigation between the United States of America and the Kingdom of Denmark, Art. XXIV(2), Oct. 1, 1951, [1961] 12 U. S. T. 935, T. I. A. S. No. 4797 ("Any dispute between the Parties as to the interpretation or application of the present Treaty, not satisfactorily adjusted by diplomacy, shall be submitted to the International Court of Justice, unless the Parties agree to settlement by some other pacific means"). In signing these treaties (in respect to, say, alien land ownership provisions) was the United States engaging in a near useless act? Does the majority believe the drafters expected Congress to enact further legislation about, say, an alien's inheritance rights, decision by decision?

I recognize, as the majority emphasizes, that the U. N. Charter uses the words "undertakes to comply," rather than, say, "shall comply" or "must comply." But what is inadequate about the word "undertak[e]"? A leading contemporary dictionary defined it in terms of "lay[ing] oneself under obligation . . . to perform or to execute." Webster's New International Dictionary 2770 (2d ed. 1939). And that definition is just what the equally authoritative Spanish version of the provision (familiar to Mexico) says directly: The words "compromete a cumplir" indicate a present obligation to execute, without any tentativeness of the sort the majority finds in the English word "undertakes." See Carta de las Naciones Unidas, Art. 94(1), 59 Stat. 1175 (1945); Spanish and English Legal and Commercial Dictionary 44 (1945) (defining "comprometer" as "become liable"); *id.,* at 59 (defining "cumplir" as "to perform, discharge, carry out, execute"); see also Art. 111, 59 Stat. 1054 (Spanish-language version equally valid); *Percheman,* 7 Pet., at 88–89 (looking to Spanish version of a treaty to clear up ambiguity in English version). Cf. *Todok* v. *Union State Bank of Harvard,* 281 U. S. 449, 453 (1930) (treating a treaty provision as self-executing even though it *expressly* stated what the majority says the

word "undertakes" *implicitly* provides: that "'[t]he United States . . . shall be at liberty to make respecting this matter, such laws as they think proper'").

And even if I agreed with JUSTICE STEVENS that the language is perfectly ambiguous (which I do not), I could not agree that "the best reading . . . is . . . one that contemplates future action by the political branches." *Ante,* at 534. The consequence of such a reading is to place the fate of an international promise made by the United States in the hands of a single State. See *ante,* at 536–537. And that is precisely the situation that the Framers sought to prevent by enacting the Supremacy Clause. See 3 Story 696 (purpose of Supremacy Clause "was probably to obviate" the "difficulty" of a system where treaties were "dependent upon the good will of the states for their execution"); see also *Ware,* 3 Dall., at 277–278 (opinion of Iredell, J.).

I also recognize, as the majority emphasizes, *ante,* at 509–511, that the U. N. Charter says that "[i]f any party to a case fails to perform the obligations incumbent upon it under a judgment rendered by the International Court of Justice, the other party may have recourse to the Security Council." Art. 94(2), 59 Stat. 1051. And when the Senate ratified the charter, it took comfort in the fact that the United States has a veto in the Security Council. See 92 Cong. Rec. 10694–10695 (1946) (statements of Sens. Pepper and Connally).

But what has that to do with the matter? To begin with, the Senate would have been contemplating politically significant ICJ decisions, not, *e. g.,* the bread-and-butter commercial and other matters that are the typical subjects of self-executing treaty provisions. And in any event, both the Senate debate and U. N. Charter provision discuss and describe what happens (or does not happen) when a nation decides *not* to carry out an ICJ decision. See Charter of the United Nations for the Maintenance of International Peace and Security: Hearings before the Senate Committee on Foreign Relations, 79th Cong., 1st Sess., 286 (1945) (statement

of Leo Pasvolsky, Special Assistant to the Secretary of State for International Organization and Security Affairs) ("[W]hen the Court has rendered a judgment and one of the parties refuses to accept it, then the dispute becomes political rather than legal"). The debates refer to remedies for a breach of our promise to carry out an ICJ decision. The Senate understood, for example, that Congress (unlike legislatures in other nations that do not permit domestic legislation to trump treaty obligations, Hollis 47–49) can block through legislation self-executing, as well as non-self-executing determinations. The debates nowhere refer to the method we use for affirmatively carrying out an ICJ obligation that no political branch has decided to dishonor, still less to a decision that the President (without congressional dissent) seeks to enforce. For that reason, these aspects of the ratification debates are here beside the point. See *infra*, at 560.

The upshot is that treaty language says that an ICJ decision is legally binding, but it leaves the implementation of that binding legal obligation to the domestic law of each signatory nation. In this Nation, the Supremacy Clause, as long and consistently interpreted, indicates that ICJ decisions rendered pursuant to provisions for binding adjudication must be domestically legally binding and enforceable in domestic courts *at least sometimes.* And for purposes of this argument, that conclusion is all that I need. The remainder of the discussion will explain why, if ICJ judgments *sometimes* bind domestic courts, then they have that effect here.

*Second,* the Optional Protocol here applies to a dispute about the meaning of a Vienna Convention provision that is itself self-executing and judicially enforceable. The Convention provision is about an individual's "rights," namely, his right upon being arrested to be informed of his separate right to contact his nation's consul. See Art. 36(1)(b), 21 U. S. T., at 101. The provision language is precise. The dis-

pute arises at the intersection of an individual right with ordinary rules of criminal procedure; it consequently concerns the kind of matter with which judges are familiar. The provisions contain judicially enforceable standards. See Art. 36(2), *ibid.* (providing for exercise of rights "in conformity with the laws and regulations" of the arresting nation provided that the "laws and regulations . . . enable full effect to be given to the purposes for which the rights accorded under this Article are intended"). And the judgment itself requires a further hearing of a sort that is typically judicial. See *infra,* at 562–564.

This Court has found similar treaty provisions self-executing. See, *e. g., Rauscher,* 119 U. S., at 410–411, 429–430 (violation of extradition treaty could be raised as defense in criminal trial); *Johnson* v. *Browne,* 205 U. S. 309, 317–322 (1907) (extradition treaty required grant of writ of habeas corpus); *Wildenhus's Case,* 120 U. S., at 11, 17–18 (treaty defined scope of state jurisdiction in a criminal case). It is consequently not surprising that, when Congress ratified the Convention, the State Department reported that the "Convention is considered entirely self-executive and does not require any implementing or complementing legislation." S. Exec. Rep. No. 91–9, p. 5 (1969); see also *id.,* at 18 ("To the extent that there are conflicts with Federal legislation or State laws the Vienna Convention, after ratification, would govern"). And the Executive Branch has said in this Court that other, indistinguishable Vienna Convention provisions are self-executing. See Brief for United States as *Amicus Curiae* in *Sanchez-Llamas* v. *Oregon,* O. T. 2005, Nos. 05–51 and 04–10566, p. 14, n. 2; cf. *ante,* at 506, n. 4 (majority leaves question open).

*Third,* logic suggests that a treaty provision providing for "final" and "binding" judgments that "settl[e]" treaty-based disputes is self-executing insofar as the judgment in question concerns the meaning of an underlying treaty provision that is itself self-executing. Imagine that two parties to a con-

tract agree to binding arbitration about whether a contract provision's word "grain" includes rye. They would expect that, if the arbitrator decides that the word "grain" does include rye, the arbitrator will then simply read the relevant provision as if it said "grain including rye." They would also expect the arbitrator to issue a binding award that embodies whatever relief would be appropriate under that circumstance.

Why treat differently the parties' agreement to binding ICJ determination about, *e. g.*, the proper interpretation of the Vienna Convention clauses containing the rights here at issue? Why not simply read the relevant Vienna Convention provisions as if (between the parties and in respect to the 51 individuals at issue) they contain words that encapsulate the ICJ's decision? See Art. 59, 59 Stat. 1062 (ICJ decision has "binding force . . . between the parties and in respect of [the] particular case"). Why would the ICJ judgment not bind in precisely the same way those words would bind if they appeared in the relevant Vienna Convention provisions—just as the ICJ says, for purposes of this case, that they do?

To put the same point differently: What sense would it make (1) to make a self-executing promise and (2) to promise to accept as final an ICJ judgment interpreting that self-executing promise, yet (3) to insist that the judgment itself is not self-executing (*i. e.*, that Congress must enact specific legislation to enforce it)?

I am not aware of any satisfactory answer to these questions. It is no answer to point to the fact that in *Sanchez-Llamas* v. *Oregon*, 548 U. S. 331 (2006), this Court interpreted the relevant Convention provisions differently from the ICJ in *Avena*. This Court's *Sanchez-Llamas* interpretation binds our courts with respect to individuals whose rights were not espoused by a state party in *Avena*. Moreover, as the Court itself recognizes, see *ante*, at 497–499, and as the President recognizes, see President's Memorandum,

the question here is the very different question of applying the ICJ's *Avena* judgment to the very parties whose interests Mexico and the United States espoused in the ICJ *Avena* proceeding. It is in respect to these individuals that the United States has promised the ICJ decision will have binding force. Art. 59, 59 Stat. 1062. See 1 Restatement (Second) of Conflict of Laws § 98 (1969); 1 Restatement (Third) of Foreign Relations § 481 (1986); 1 Restatement (Second) of Judgments § 17 (1980) (all calling for recognition of judgment rendered after fair hearing in a contested proceeding before a court with adjudicatory authority over the case). See also 1 Restatement (Second) of Conflict of Laws § 106 ("A judgment will be recognized and enforced in other states even though an error of fact or of law was made in the proceedings before judgment . . . "); *id.*, § 106, Comment *a* ("Th[is] rule is . . . applicable to judgments rendered in foreign nations . . . "); Reese, The Status in This Country of Judgments Rendered Abroad, 50 Colum. L. Rev. 783, 789 (1950) ("[Foreign] judgments will not be denied effect merely because the original court made an error either of fact or of law").

Contrary to the majority's suggestion, see *ante,* at 511–512, that binding force does not disappear by virtue of the fact that Mexico, rather than Medellín himself, presented his claims to the ICJ. Mexico brought the *Avena* case in part in "the exercise of its right of diplomatic protection of its nationals," *e. g.*, 2004 I. C. J., at 20–21, ¶¶ 13(1), (3), including Medellín, see *id.,* at 25, ¶ 16. Such derivative claims are a well-established feature of international law, and the United States has several times asserted them on behalf of its own citizens. See 2 Restatement (Third) of Foreign Relations, *supra,* § 713, Comments *a, b,* at 217–218; *Case Concerning Elettronic Sicula S. p. A. (U. S.* v. *Italy),* 1989 I. C. J. 15, 20 (Judgment of July 20); *Case Concerning United States Diplomatic and Consular Staff in Tehran (U. S.* v. *Iran),* 1979 I. C. J. 7, 8 (Judgment of Dec. 15); *Case Concerning*

*Rights of Nationals of the United States of America in Morocco (Fr. v. U. S.),* 1952 I. C. J. 176, 180–181 (Judgment of Aug. 27). They are treated in relevant respects as the claims of the represented individuals themselves. See 2 Restatement (Third) of Foreign Relations, §713, Comments *a, b.* In particular, they can give rise to remedies, tailored to the individual, that bind the nation against whom the claims are brought (here, the United States). See *ibid.;* see also, *e. g., Frelinghuysen* v. *Key,* 110 U. S. 63, 71–72 (1884).

Nor does recognition of the ICJ judgment as binding with respect to the individuals whose claims were espoused by Mexico in any way derogate from the Court's holding in *Sanchez-Llamas, supra.* See *ante,* at 512–513, n. 8. This case does not implicate the general interpretive question answered in *Sanchez-Llamas:* whether the Vienna Convention displaces state procedural rules. We are instead confronted with the discrete question of Texas' obligation to comply with a binding judgment ·issued by a tribunal with undisputed jurisdiction to adjudicate the rights of the individuals named therein. "It is inherent in international adjudication that an international tribunal may reject one country's legal position in favor of another's—and the United States explicitly accepted this possibility when it ratified the Optional Protocol." Brief for United States as *Amicus Curiae* 22.

*Fourth,* the majority's very different approach has seriously negative practical implications. The United States has entered into at least 70 treaties that contain provisions for ICJ dispute settlement similar to the Protocol before us. Many of these treaties contain provisions similar to those this Court has previously found self-executing—provisions that involve, for example, property rights, contract and commercial rights, trademarks, civil liability for personal injury, rights of foreign diplomats, taxation, domestic-court jurisdiction, and so forth. Compare Appendix A, *infra,* with Appendix B, *infra.* If the Optional Protocol here, taken to-

gether with the U. N. Charter and its annexed ICJ Statute, is insufficient to warrant enforcement of the ICJ judgment before us, it is difficult to see how one could reach a different conclusion in any of these other instances. And the consequence is to undermine longstanding efforts in those treaties to create an effective international system for interpreting and applying many, often commercial, self-executing treaty provisions. I thus doubt that the majority is right when it says, "We do not suggest that treaties can never afford binding domestic effect to international tribunal judgments." *Ante*, at 519. In respect to the 70 treaties that currently refer disputes to the ICJ's binding adjudicatory authority, some multilateral, some bilateral, that is just what the majority has done.

Nor can the majority look to congressional legislation for a quick fix. Congress is unlikely to authorize automatic judicial enforceability of *all* ICJ judgments, for that could include some politically sensitive judgments and others better suited for enforcement by other branches: for example, those touching upon military hostilities, naval activity, handling of nuclear material, and so forth. Nor is Congress likely to have the time available, let alone the will, to legislate judgment-by-judgment enforcement of, say, the ICJ's (or other international tribunals') resolution of non-politically-sensitive commercial disputes. And as this Court's prior case law has avoided laying down bright-line rules but instead has adopted a more complex approach, it seems unlikely that Congress will find it easy to develop legislative bright lines that pick out those provisions (addressed to the Judicial Branch) where self-execution seems warranted. But, of course, it is not necessary for Congress to do so—at least not if one believes that this Court's Supremacy Clause cases *already* embody criteria likely to work reasonably well. It is those criteria that I would apply here.

*Fifth,* other factors, related to the particular judgment here at issue, make that judgment well suited to direct judi-

cial enforcement. The specific issue before the ICJ concerned " 'review and reconsideration' " of the "possible prejudice" caused in each of the 51 affected cases by an arresting State's failure to provide the defendant with rights guaranteed by the Vienna Convention. *Avena,* 2004 I. C. J., at 65, ¶ 138. This review will call for an understanding of how criminal procedure works, including whether, and how, a notification failure may work prejudice. *Id.,* at 56–57. As the ICJ itself recognized, "it is the judicial process that is suited to this task." *Id.,* at 66, ¶ 140. Courts frequently work with criminal procedure and related prejudice. Legislatures do not. Judicial standards are readily available for working in this technical area. Legislative standards are not readily available. Judges typically determine such matters, deciding, for example, whether further hearings are necessary, after reviewing a record in an individual case. Congress does not normally legislate in respect to individual cases. Indeed, to repeat what I said above, what kind of special legislation does the majority believe Congress ought to consider?

*Sixth,* to find the United States' treaty obligations self-executing as applied to the ICJ judgment (and consequently to find that judgment enforceable) does not threaten constitutional conflict with other branches; it does not require us to engage in nonjudicial activity; and it does not require us to create a new cause of action. The only question before us concerns the application of the ICJ judgment as binding law applicable to the parties in a particular criminal proceeding that Texas law creates independently of the treaty. I repeat that the question before us does not involve the creation of a private right of action (and the majority's reliance on authority regarding such a circumstance is misplaced, see *ante,* at 506, n. 3).

*Seventh,* neither the President nor Congress has expressed concern about direct judicial enforcement of the ICJ decision. To the contrary, the President favors enforcement of this

judgment. Thus, insofar as foreign policy impact, the inter-relation of treaty provisions, or any other matter within the President's special treaty, military, and foreign affairs responsibilities might prove relevant, such factors *favor*, rather than militate against, enforcement of the judgment before us. See, *e. g.*, *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 348 (2005) (noting Court's "customary policy of deference to the President in matters of foreign affairs").

For these seven reasons, I would find that the United States' treaty obligation to comply with the ICJ judgment in *Avena* is enforceable in court in this case without further congressional action beyond Senate ratification of the relevant treaties. The majority reaches a different conclusion because it looks for the wrong thing (explicit textual expression about self-execution) using the wrong standard (clarity) in the wrong place (the treaty language). Hunting for what the text cannot contain, it takes a wrong turn. It threatens to deprive individuals, including businesses, property owners, testamentary beneficiaries, consular officials, and others, of the workable dispute resolution procedures that many treaties, including commercially oriented treaties, provide. In a world where commerce, trade, and travel have become ever more international, that is a step in the wrong direction.

Were the Court for a moment to shift the direction of its legal gaze, looking instead to the Supremacy Clause and to the extensive case law interpreting that Clause as applied to treaties, I believe it would reach a better supported, more felicitous conclusion. That approach, well embedded in Court case law, leads to the conclusion that the ICJ judgment before us is judicially enforceable without further legislative action.

## II

A determination that the ICJ judgment is enforceable does not quite end the matter, for the judgment itself requires us to make one further decision. It directs the

United States to provide further judicial review of the 51 cases of Mexican nationals "by means of its own choosing." *Avena,* 2004 I. C. J., at 72, ¶ 153(9). As I have explained, I believe the judgment addresses itself to the Judicial Branch. This Court consequently must "choose" the means. And rather than, say, conducting the further review in this Court, or requiring Medellín to seek the review in another federal court, I believe that the proper forum for review would be the Texas-court proceedings that would follow a remand of this case.

Beyond the fact that a remand would be the normal course upon reversing a lower court judgment, there are additional reasons why further state-court review would be particularly appropriate here. The crime took place in Texas, and the prosecution at issue is a Texas prosecution. The President has specifically endorsed further Texas-court review. See President's Memorandum. The ICJ judgment requires further hearings as to whether the police failure to inform Medellín of his Vienna Convention rights prejudiced Medellín, even if such hearings would not otherwise be available under Texas' procedural default rules. While Texas has already considered that matter, it did not consider fully, for example, whether appointed counsel's coterminous 6-month suspension from the practice of the law "caused actual prejudice to the defendant"—prejudice that would not have existed had Medellín known he could contact his consul and thereby find a different lawyer. *Id.,* at 60, ¶ 121.

Finally, Texas law authorizes a criminal defendant to seek postjudgment review. See Tex. Code Crim. Proc. Ann., Art. 11.071, § 5(a)(1) (Vernon Supp. 2006). And Texas law provides for further review where American law provides a "'legal basis'" that was previously "'unavailable.'" See *Ex parte Medellín,* 223 S. W. 3d 315, 352 (Tex. Crim. App. 2006). Thus, I would send this case back to the Texas courts, which must then apply the *Avena* judgment as binding law. See U. S. Const., Art. VI, cl. 2; see also, *e. g.,*

*Dominguez* v. *State*, 90 Tex. Crim. 92, 99, 234 S. W. 79, 83 (1921) (recognizing that treaties are "part of the supreme law of the land" and that "it is the duty of the courts of the state to take cognizance of, construe and give effect" to them (internal quotation marks omitted)).

### III

Because the majority concludes that the Nation's international legal obligation to enforce the ICJ's decision is not automatically a domestic legal obligation, it must then determine whether the President has the constitutional authority to enforce it. And the majority finds that he does not. See Part III, *ante.*

In my view, that second conclusion has broader implications than the majority suggests. The President here seeks to implement treaty provisions in which the United States agrees that the ICJ judgment is binding with respect to the *Avena* parties. Consequently, his actions draw upon his constitutional authority in the area of foreign affairs. In this case, his exercise of that power falls within that middle range of Presidential authority where Congress has neither specifically authorized nor specifically forbidden the Presidential action in question. See *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 637 (1952) (Jackson, J., concurring). At the same time, if the President were to have the authority he asserts here, it would require setting aside a state procedural law.

It is difficult to believe that in the exercise of his Article II powers pursuant to a ratified treaty, the President can *never* take action that would result in setting aside state law. Cf. *United States* v. *Pink*, 315 U. S. 203, 233 (1942) ("No State can rewrite our foreign policy to conform to its own domestic policies"). Suppose that the President believes it necessary that he implement a treaty provision requiring a prisoner exchange involving someone in state custody in order to avoid a proven military threat. Cf. *Ware*, 3 Dall., at 205.

Or suppose he believes it necessary to secure a foreign consul's treaty-based rights to move freely or to contact an arrested foreign national. Cf. Vienna Convention, Art. 34, 21 U. S. T., at 98. Does the Constitution require the President in each and every such instance to obtain a special statute authorizing his action? On the other hand, the Constitution must impose significant restrictions upon the President's ability, by invoking Article II treaty-implementation authority, to circumvent ordinary legislative processes and to preempt state law as he does so.

Previously this Court has said little about this question. It has held that the President has a fair amount of authority to make and to implement executive agreements, at least in respect to international claims settlement, and that this authority can require contrary state law to be set aside. See, e. g., *Pink, supra,* at 223, 230–231, 233–234; *United States* v. *Belmont,* 301 U. S. 324, 326–327 (1937). It has made clear that principles of foreign sovereign immunity trump state law and that the Executive, operating without explicit legislative authority, can assert those principles in state court. See *Ex parte Peru,* 318 U. S. 578, 588 (1943). It has also made clear that the Executive has inherent power to bring a lawsuit "to carry out treaty obligations." *Sanitary Dist. of Chicago* v. *United States,* 266 U. S. 405, 425, 426 (1925). But it has reserved judgment as to "the scope of the President's power to preempt state law pursuant to authority delegated by . . . a ratified treaty"—a fact that helps to explain the majority's inability to find support in precedent for its own conclusions. *Barclays Bank PLC* v. *Franchise Tax Bd. of Cal.,* 512 U. S. 298, 329 (1994).

Given the Court's comparative lack of expertise in foreign affairs; given the importance of the Nation's foreign relations; given the difficulty of finding the proper constitutional balance among state and federal, executive and legislative, powers in such matters; and given the likely future importance of this Court's efforts to do so, I would very much

hesitate before concluding that the Constitution implicitly sets forth broad prohibitions (or permissions) in this area. Cf. *ante*, at 523, n. 13 (stating that the Court's holding is "limited" by the facts that (1) this treaty is non-self-executing and (2) the judgment of an international tribunal is involved).

I would thus be content to leave the matter in the constitutional shade from which it has emerged. Given my view of this case, I need not answer the question. And I shall not try to do so. That silence, however, cannot be taken as agreement with the majority's Part III conclusion.

## IV

The majority's two holdings taken together produce practical anomalies. They unnecessarily complicate the President's foreign affairs task insofar as, for example, they increase the likelihood of Security Council *Avena* enforcement proceedings, of worsening relations with our neighbor Mexico, of precipitating actions by other nations putting at risk American citizens who have the misfortune to be arrested while traveling abroad, or of diminishing our Nation's reputation abroad as a result of our failure to follow the "rule of law" principles that we preach. The holdings also encumber Congress with a task (postratification legislation) that, in respect to many decisions of international tribunals, it may not want and which it may find difficult to execute. See *supra*, at 560 (discussing the problems with case-by-case legislation). At the same time, insofar as today's holdings make it more difficult to enforce the judgments of international tribunals, including technical non-politically-controversial judgments, those holdings weaken that rule of law for which our Constitution stands. Cf. Hughes Defends Foreign Policies in Plea for Lodge, N. Y. Times, Oct. 31, 1922, p. 1, col. 1, p. 4, col. 1 (then-Secretary of State Charles Evans Hughes stating that "we favor, and always have favored, an inter-

national court of justice for the determination according to judicial standards of justiciable international disputes"); Mr. Root Discusses International Problems, N. Y. Times, July 9, 1916, section 6, book review p. 276 (former Secretary of State and U. S. Senator Elihu Root stating that "'a court of international justice with a general obligation to submit all justiciable questions to its jurisdiction and to abide by its judgment is a primary requisite to any real restraint of law'"); Mills, The Obligation of the United States Toward the World Court, 114 Annals of the American Academy of Political and Social Science 128 (1924) (Congressman Ogden Mills describing the efforts of then-Secretary of State John Hay, and others, to establish a world court, and the support therefor).

These institutional considerations make it difficult to reconcile the majority's holdings with the workable Constitution that the Founders envisaged. They reinforce the importance, in practice and in principle, of asking Chief Justice Marshall's question: Does a treaty provision address the "Judicial" Branch rather than the "Political Branches" of Government. See *Foster*, 2 Pet., at 314. And they show the wisdom of the well-established precedent that indicates that the answer to the question here is "yes." See Parts I and II, *supra*.

## V

In sum, a strong line of precedent, likely reflecting the views of the Founders, indicates that the treaty provisions before us and the judgment of the International Court of Justice address themselves to the Judicial Branch and consequently are self-executing. In reaching a contrary conclusion, the Court has failed to take proper account of that precedent and, as a result, the Nation may well break its word even though the President seeks to live up to that word and Congress has done nothing to suggest the contrary.

For the reasons set forth, I respectfully dissent.

## APPENDIXES

### A

Examples of Supreme Court decisions considering a treaty provision to be self-executing. Parentheticals indicate the subject matter; an asterisk indicates that the Court applied the provision to invalidate a contrary state or territorial law or policy.

1. *Olympic Airways* v. *Husain,* 540 U. S. 644, 649, 657 (2004) (air-carrier liability)
2. *El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng,* 525 U. S. 155, 161–163, 176 (1999) (same)*
3. *Zicherman* v. *Korean Air Lines Co.,* 516 U. S. 217, 221, 231 (1996) (same)
4. *Société Nationale Industrielle Aérospatiale* v. *United States Dist. Court for Southern Dist. of Iowa,* 482 U. S. 522, 524, 533 (1987) (international discovery rules)
5. *Sumitomo Shoji America, Inc.* v. *Avagliano,* 457 U. S. 176, 181, 189–190 (1982) (employment practices)
6. *Trans World Airlines, Inc.* v. *Franklin Mint Corp.,* 466 U. S. 243, 245, 252 (1984) (air-carrier liability)
7. *Kolovrat* v. *Oregon,* 366 U. S. 187, 191, n. 6, 198 (1961) (property rights and inheritance)*
8. *Clark* v. *Allen,* 331 U. S. 503, 507–508, 517–518 (1947) (same)*
9. *Bacardi Corp. of America* v. *Domenech,* 311 U. S. 150, 160, and n. 9, 161 (1940) (trademark)*
10. *Todok* v. *Union State Bank of Harvard,* 281 U. S. 449, 453, 455 (1930) (property rights and inheritance)
11. *Nielsen* v. *Johnson,* 279 U. S. 47, 50, 58 (1929) (taxation)*
12. *Jordan* v. *Tashiro,* 278 U. S. 123, 126–127, n. 1, 128–129 (1928) (trade and commerce)
13. *Asakura* v. *Seattle,* 265 U. S. 332, 340, 343–344 (1924) (same)*

14. *Maiorano* v. *Baltimore & Ohio R. Co.,* 213 U. S. 268, 273–274 (1909) (travel, trade, access to courts)
15. *Johnson* v. *Browne,* 205 U. S. 309, 317–322 (1907) (extradition)
16. *Geofroy* v. *Riggs,* 133 U. S. 258, 267–268, 273 (1890) (inheritance)*
17. *Wildenhus's Case,* 120 U. S. 1, 11, 17–18 (1887) (criminal jurisdiction)
18. *United States* v. *Rauscher,* 119 U. S. 407, 410–411, 429–430 (1886) (extradition)
19. *Hauenstein* v. *Lynham,* 100 U. S. 483, 485–486, 490–491 (1880) (property rights and inheritance)*
20. *American Ins. Co.* v. *356 Bales of Cotton,* 1 Pet. 511, 542 (1828) (property)
21. *United States* v. *Percheman,* 7 Pet. 51, 88–89 (1833) (land ownership)
22. *United States* v. *Arredondo,* 6 Pet. 691, 697, 749 (1832) (same)
23. *Orr* v. *Hodgson,* 4 Wheat. 453, 462–465 (1819) (same)*
24. *Chirac* v. *Lessee of Chirac,* 2 Wheat. 259, 270–271, 274, 275 (1817) (land ownership and inheritance)*
25. *Fairfax's Devisee* v. *Hunter's Lessee,* 7 Cranch 603, 626–627 (1813) (land ownership)
26. *Hannay* v. *Eve,* 3 Cranch 242, 248 (1806) (monetary debts)
27. *Hopkirk* v. *Bell,* 3 Cranch 454, 457–458 (1806) (same)*
28. *Ware* v. *Hylton,* 3 Dall. 199, 203–204, 285 (1796) (same)*
29. *Georgia* v. *Brailsford,* 3 Dall. 1, 4 (1794) (same)

## B

United States treaties in force containing provisions for the submission of treaty-based disputes to the International Court of Justice. Parentheticals indicate subject matters

that can be the subject of ICJ adjudication that are of the sort that this Court has found self-executing.

*Economic Cooperation Agreements*

1. Economic Aid Agreement Between the United States of America and Spain, Sept. 26, 1953, [1953] 4 U. S. T. 1903, 1920–1921, T. I. A. S. No. 2851 (property and contract)

2. Agreement for Economic Assistance Between the Government of the United States of America and the Government of Israel Pursuant to the General Agreement for Technical Cooperation, May 9, 1952, [1952] 3 U. S. T. 4174, 4177, T. I. A. S. No. 2561 (same)

3. Economic Cooperation Agreement Between the United States of America and Portugal, 62 Stat. 2861–2862 (1948) (same)

4. Economic Cooperation Agreement Between the United States of America and the United Kingdom, 62 Stat. 2604 (1948) (same)

5. Economic Cooperation Agreement Between the United States of America and the Republic of Turkey, 62 Stat. 2572 (1948) (same)

6. Economic Cooperation Agreement Between the United States of America and Sweden, 62 Stat. 2557 (1948) (same)

7. Economic Cooperation Agreement Between the United States of America and Norway, 62 Stat. 2531 (1948) (same)

8. Economic Cooperation Agreement Between the Governments of the United States of America and the Kingdom of the Netherlands, 62 Stat. 2500 (1948) (same)

9. Economic Cooperation Agreement Between the United States of America and the Grand Duchy of Luxembourg, 62 Stat. 2468 (1948) (same)

10. Economic Cooperation Agreement Between the United States of America and Italy, 62 Stat. 2440 (1948) (same)
11. Economic Cooperation Agreement Between the United States of America and Iceland, 62 Stat. 2390 (1948) (same)
12. Economic Cooperation Agreement Between the United States of America and Greece, 62 Stat. 2344 (1948) (same)
13. Economic Cooperation Agreement Between the United States of America and France, 62 Stat. 2232, 2233 (1948) (same)
14. Economic Cooperation Agreement Between the United States of America and Denmark, 62 Stat. 2214 (1948) (same)
15. Economic Cooperation Agreement Between the United States of America and the Kingdom of Belgium, 62 Stat. 2190 (1948) (same)
16. Economic Cooperation Agreement Between the United States of America and Austria, 62 Stat. 2144 (1948) (same)

*Bilateral Consular Conventions*

1. Consular Convention Between the United States of America and the Kingdom of Belgium, Sept. 2, 1969, [1974] 25 U. S. T. 41, 47–49, 56–57, 60–61, 75, T. I. A. S. No. 7775 (domestic-court jurisdiction and authority over consular officers, taxation of consular officers, consular notification)
2. Consular Convention Between the United States of America and the Republic of Korea, Jan. 8, 1963, [1963] 14 U. S. T. 1637, 1641, 1644–1648, T. I. A. S. No. 5469 (same)

*Friendship, Commerce, and Navigation Treaties*

1. Treaty of Amity and Economic Relations Between the United States of America and the Togolese Re-

public, Feb. 8, 1966, [1967] 18 U. S. T. 1, 3–4, 10, T. I. A. S. No. 6193 (contracts and property)

2. Treaty of Friendship, Establishment and Navigation Between the United States of America and the Kingdom of Belgium, Feb. 21, 1961, [1963] 14 U. S. T. 1284, 1290–1291, 1307, T. I. A. S. No. 5432 (same)

3. Treaty of Friendship, Establishment and Navigation Between the United States of America and the Grand Duchy of Luxembourg, Feb. 23, 1962, [1963] 14 U. S. T. 251, 254–255, 262, T. I. A. S. No. 5306 (consular notification; contracts and property)

4. Treaty of Friendship, Commerce and Navigation Between the United States of America and the Kingdom of Denmark, Oct. 1, 1951, [1961] 12 U. S. T. 908, 912–913, 935, T. I. A. S. No. 4797 (contracts and property)

5. Treaty of Friendship and Commerce Between the United States of America and Pakistan, Nov. 12, 1959, [1961] 12 U. S. T. 110, 113, 123, T. I. A. S. No. 4683 (same)

6. Convention of Establishment Between the United States of America and France, Nov. 25, 1959, [1960] 11 U. S. T. 2398, 2401–2403, 2417, T. I. A. S. No. 4625 (same)

7. Treaty of Friendship, Commerce and Navigation Between the United States of America and the Republic of Korea, Nov. 28, 1956, [1957] 8 U. S. T. 2217, 2221–2222, 2233, T. I. A. S. No. 3947 (same)

8. Treaty of Friendship, Commerce and Navigation Between the United States of America and the Kingdom of the Netherlands, Mar. 27, 1956, [1957] 8 U. S. T. 2043, 2047–2050, 2082–2083, T. I. A. S. No. 3942 (freedom to travel, consular notification, contracts and property)

9. Treaty of Amity, Economic Relations, and Consular Rights Between the United States of America and Iran, Aug. 15, 1955, [1957] 8 U. S. T. 899, 903, 907,

913, T. I. A. S. No. 3853 (property and freedom of commerce)

10. Treaty of Friendship, Commerce and Navigation Between the United States of America and the Federal Republic of Germany, Oct. 29, 1954, [1956] 7 U. S. T. 1839, 1844–1846, 1867, T. I. A. S. No. 3593 (property and contract)

11. Treaty of Friendship, Commerce and Navigation Between the United States of America and Greece, Aug. 3, 1951, [1954] 5 U. S. T. 1829, 1841–1847, 1913–1915, T. I. A. S. No. 3057 (same)

12. Treaty of Friendship, Commerce and Navigation Between the United States of America and Israel, Aug. 23, 1951, [1954] 5 U. S. T. 550, 555–556, 575, T. I. A. S. No. 2948 (same)

13. Treaty of Amity and Economic Relations Between the United States of America and Ethiopia, Sept. 7, 1951, [1953] 4 U. S. T. 2134, 2141, 2145, 2147, T. I. A. S. No. 2864 (property and freedom of commerce)

14. Treaty of Friendship, Commerce and Navigation Between the United States of America and Japan, Apr. 2, 1953, [1953] 4 U. S. T. 2063, 2067–2069, 2080, T. I. A. S. No. 2863 (property and contract)

15. Treaty of Friendship, Commerce and Navigation Between the United States of America and Ireland, Jan. 21, 1950, [1950] 1 U. S. T. 785, 792–794, 801, T. I. A. S. No. 2155 (same)

16. Treaty of Friendship, Commerce and Navigation Between the United States of America and the Italian Republic, 63 Stat. 2262, 2284, 2294 (1948) (property and freedom of commerce)

*Multilateral Conventions*

1. Patent Cooperation Treaty, June 19, 1970, [1976–77] 28 U. S. T. 7645, 7652–7676, 7708, T. I. A. S. No. 8733 (patents)

2. Universal Copyright Convention, July 24, 1971, [1974] 25 U. S. T. 1341, 1345, 1366, T. I. A. S. No. 7868 (copyright)

3. Vienna Convention on Diplomatic Relations and the Optional Protocol Concerning the Compulsory Settlement of Disputes, Apr. 18, 1961, [1972] 23 U. S. T. 3227, 3240–3243, 3375, T. I. A. S. No. 7502 (rights of diplomats in foreign nations)

4. Paris Convention for the Protection of Industrial Property, July 14, 1967, [1970] 21 U. S. T. 1583, 1631–1639, 1665–1666, T. I. A. S. No. 6923 (patents)

5. Convention on the Privileges and Immunities of the United Nations, Feb. 13, 1946, [1970] 21 U. S. T. 1418, 1426–1428, 1430–1432, 1438–1440, T. I. A. S. No. 6900 (rights of U. N. diplomats and officials)

6. Convention on Offences and Certain Other Acts Committed on Board Aircraft, Sept. 14, 1963, [1969] 20 U. S. T. 2941, 2943–2947, 2952, T. I. A. S. No. 6768 (airlines' treatment of passengers)

7. Agreement for Facilitating the International Circulation of Visual and Auditory Materials of an Educational, Scientific and Cultural Character, July 15, 1949, [1966] 17 U. S. T. 1578, 1581, 1586, T. I. A. S. No. 6116 (customs duties on importation of films and recordings)

8. Universal Copyright Convention, Sept. 6, 1952, [1955] 6 U. S. T. 2731, 2733–2739, 2743, T. I. A. S. No. 3324 (copyright)

9. Treaty of Peace With Japan, Sept. 8, 1951, [1952] 3 U. S. T. 3169, 3181–3183, 3188, T. I. A. S. No. 2490 (property)

10. Convention on Road Traffic, Sept. 19, 1949, [1952] 3 U. S. T. 3008, 3012–3017, 3020, T. I. A. S. No. 2487 (rights and obligations of drivers)

11. Convention on International Civil Aviation, 61 Stat. 1204 (1944) (seizure of aircraft to satisfy patent claims)